## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ALLIED CONSTRUCTION INDUSTRIES,      CASE NO.: 1-14-CV-450

            Plaintiff,             Judge Michael R. Barrett

     v.

CITY OF CINCINNATI,

            Defendant.

### OPINION AND ORDER

This matter is before the Court on Plaintiff Allied Construction Industries' motion for injunctive relief. (Doc. 2).[1] Defendant City of Cincinnati filed a response in opposition (Doc. 10), and Plaintiff Allied Construction Industries filed a reply (Doc. 12). On June 17, 2014, the Court held a preliminary injunction hearing. (Doc. 13). This matter is now ripe for decision.

## I.    FACTUAL OVERVIEW

### A. The Parties

According to Plaintiff Allied Construction Industries' ("ACI") Verified Complaint, ACI is a not-for-profit trade association comprised of approximately 580 member companies who employ more than 30,000 individuals throughout the Greater Cincinnati area. (Doc. 1, p. 1).[2] The membership includes general contractors, subcontractors, architects, engineers, developers, material suppliers and service providers to the commercial construction industry. (*Id.* at 1-2). Many of ACI's members provide construction services for both public and private projects in the

---

[1] The motion is captioned as a Motion for a Temporary Restraining Order. (Doc. 2). On June 3, 2014, the Court entered an agreed temporary restraining order and set a preliminary injunction hearing for June 17, 2014. (Doc. 7). The motion thus is considered as a request for a preliminary injunction.

[2] Unless otherwise indicated, all citations to page numbers of Court documents herein correspond to the PAGEID numbers provided by the Court's electronic filing system.

southwestern Ohio trade area. (*Id.* at 1-2). Its members include both union and open-shop contractors. (*Id.* at 2).

Defendant City of Cincinnati ("the City") is a municipal corporation located in Hamilton County, Ohio, which is organized and existing under the laws of the State of Ohio. (Doc. 1, p. 2). The City has embarked on a significant water works upgrade program that will result in an estimated $15-$20 million of construction projects being led by the City's Water Works Division. (*Id.* at 6).

**B.**     **The Responsible Bidder Ordinance**

On July 26, 2012, the City enacted under the Cincinnati Municipal Code ("CMC") the Responsible Bidder Ordinance ("RBO"), CMC Chapter 320, which affects the award of construction contracts for water works projects issued by the City. (Doc. 1, pp. 2-3). The three RBO provisions at issue here concern apprenticeship requirements, two of the lowest-and-best bidder factors, and the pre-apprenticeship training fund.

The apprenticeship requirements in Section 320-5 of the CMC require bidders and the bidders' subcontractors to participate in an apprenticeship program for the primary apprenticeable occupation on the project that has graduated at least one apprentice from the apprenticeship program for each of the past five years. (Doc. 1, p. 3); CMC 320-5. The apprenticeship requirement is inapplicable, however, a) if the construction contract is less than $400,000, and b) to a subcontractor that is a registered small business enterprise with the Metropolitan Sewer District of Greater Cincinnati ("MSD") or is a small business enterprise certified by the City, if the value of the subcontract with that subcontractor is under $250,000. CMC 320-5, 320-1-C1.

The two lowest-and-best bidder factors in Sections 320-3(j) and (k) of the CMC require bidders on Cincinnati Water Works ("CWW") and MSD projects to certify whether they provide a health care plan and a pension or retirement program to their employees.  (Doc. 1, p. 3); CMC 320-3(j), (k). Those provisions require that the contributions "be part of the employee's regular compensation and not merely part of the employee's compensation during the period of time for which the employee is performing work on the project."  CMC 320-3(j), (k).  Those certifications are factors considered by the City in determining the lowest and best bidder for a construction contract.  CMC 320-3.

The pre-apprenticeship training fund provision in Section 320-7 of the CMC requires contractors[3] on CWW and MSD projects to pay $.10 per hour per worker "for the purpose of funding qualified pre-apprenticeship programs that will create a pipeline of opportunities from recruitment to placement to retention."  CMC 320-7; *see also* (Doc. 1, p. 3).  The payment "shall go into MSDGC Fund 701 where the project is managed by MSDGC and into water works Fund 101 where the project is managed by water works."  *Id.*  The payments, however, may "not be taken from the fringe benefits of the contractor's employees."  *Id.*

C.  **Recent Projects**

Since the implementation of the revised June 2013 RBO provisions, several projects of the City have been awarded or opened for bids.  The first project was the "Donjoy" Water Main Project.  (Doc. 1, p. 8).  The approximate value of the Donjoy Project is $1.3 million.  (*Id.*)  The deadline for submitting bids for that project was April 15, 2014.  (*Id.*)  R&B was awarded the Donjoy Project.  (*Id.*)  R&B recently had become a participant in the union apprenticeship program.  (*Id.* at 8-9).

---

[3] "Contractor" is defined in the RBO as "any person or company that has entered into a Construction Contract with the City."  CMC 320-1C2.

The second project was the "Vernon" Water Main Project. (*Id.* at 9). The approximate value of the Vernon Project is $750,000. (*Id.*) Two open-shop ACI member companies – Prus Construction and Hartman & Smith – submitted bids on the Vernon Project. (*Id.* at 9). Prus Construction bid $756,871.20 and Hartman & Smith bid $813,000. (*Id.*) Prus Construction and Harman & Smith were notified that they would not be awarded the Vernon Project because their bids were non-responsive. (*Id.*) The third lowest bidder on the Vernon Project is Ford Development Corporation, which is a union contractor. (*Id.*) Ford's bid is $962,000. (*Id.*) The Construction Bid Document for the Vernon Project provides that the RBO is applicable to the project. (*Id.*) The parties have agreed, however, that the contract for the Vernon Project will not be awarded pending further order of the Court. (Doc. 7).

Several Water Main projects of the City currently remain pending. The projects total approximately $7,060,000. (Doc. 1, p. 9). One of those projects is the "Mohawk" Water Main Project, which is valued at $1.3 million. (*Id.*) The bids for the Mohawk Project were due on June 3, 2014. (*Id.*) A second pending Water Main Project is the "Ludlow" Water Main Project, which is valued at $2 million. (*Id.* at 10). The bids for the Ludlow Project were due on June 5, 2014. (*Id.*) For each of those pending projects, the parties have agreed that the City will not award the contracts for those projects until further order of the Court. (Doc. 7).[4]

## II.    STANDARD FOR INJUNCTIVE RELIEF

Under Federal Rule of Civil Procedure 65, injunctive relief is an extraordinary remedy, the purpose of which is to preserve the status quo. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). In determining whether to grant or deny a preliminary injunction, this Court must consider four factors:  1) whether the movant has

---

[4] The Temporary Restraining Order also precludes the City from awarding contracts until further order of the Court on several other projects not specifically identified in the Verified Complaint. (*See* Doc. 7).

4

a likelihood of success on the merits; 2) whether the movant would suffer irreparable injury without the injunction; 3) whether issuance of the injunction would cause substantial harm to others; and 4) whether the public interest would be served by the issuance of the injunction. *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004) (quoting *Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997)). The foregoing factors are not prerequisites, but rather are factors that the Court should balance. *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004). On a preliminary injunction, "a plaintiff must show more than a mere possibility of success,'" but need not "'prove his case in full." *Certified Restoration Dry Cleaning Network*, 511 F.3d at 543. "'[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation.'" *Northeast Ohio Coalition v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997)).

## III.   ANALYSIS

For the reasons set forth below, the Court concludes that ACI has satisfied its burden for obtaining preliminary injunctive relief.

### A.   Likelihood of Success

ACI argues that the Supremacy Clause, U.S. Const. art. VI § 2, and the preemption provision of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1144(a), prohibit the application of three provisions of the City's RBO when awarding its water works construction contracts. ERISA is a federal law that regulates employee benefit plans. 29 U.S.C. §§ 1002-1461. "Congress enacted ERISA to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for

employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting 29 U.S.C. § 1001(b)) (alteration and ellipses in original). The statute seeks "to provide a uniform regulatory regime over employee benefit plans." *Davilla*, 542 U.S. at 208. To promote that uniformity, ERISA contains a broad preemption provision that "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" falling within the regulatory scheme. 29 U.S.C. § 1144(a). The "employee benefit plans" referred to therein include those plans, funds or programs established or maintained by the employer or an employee organization, or both, for the purpose of providing its participants or beneficiaries, among other benefits, "medical, surgical, or hospital care or benefits," "apprenticeship or other training programs," and "pension" or "retirement income." 29 U.S.C. § 1002(1)-(2).

Historically, it has been a challenging task for the courts to determine when a law "relates to" ERISA for the purposes of preemption. *See California Div. of Labor Standards Enforcement v. Dillingham Constr.* 519 U.S. 316, 324 (1997); *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-99 (1983). The Supreme Court, however, has provided a general framework to guide the analysis by defining a law that "relates to" an ERISA-covered plan as one that either 1) "references" such a plan or 2) has a "connection with" the plan. *Dillingham*, 519 U.S. at 324-25. To "reference" an ERISA plan, the law at issue must "act[] immediately and exclusively upon [the] ERISA plan[]" or the ERISA plan must be "essential to the law's operation." *Id.* at 325. To have the requisite "connection with" an ERISA plan, the law at issue must mandate (or effectively mandate) something, and that mandate must fall within the area that Congress

intended ERISA to control exclusively.  *Associated Builders & Contrs. v. Mich. Dep't of Labor & Economic Growth*, 543 F.3d 275, 281 (6th Cir. 2008) (citing *Dillingham*, 519 U.S. at 325).

### 1.  Apprenticeship requirements (CMS 320-5)

#### a.  Overview of parties' arguments

ACI contends that the apprenticeship requirements in Section 320-5 are preempted by ERISA because they require a bidder to maintain or participate in a specific type of apprenticeship program – i.e., the labor union's apprenticeship program – in order to qualify for certain construction contracts.  ACI argues that the requirement precludes its members from effectively bidding on those construction contracts, and interferes with ACI's ERISA-compliant apprenticeship plans so as to disturb the uniformity of its administration.  In support, ACI relies heavily on the decision of the District of Massachusetts in *Utility Contractors Association of New England, Inc. v. City of Fall River*, No. 10-10994, 2011 U.S. Dist. LEXIS 114333 (D. Mass. Oct. 4, 2011).

The City opposes ACI's arguments, relying heavily on the Sixth Circuit's decision in *Associated Builders*, 543 F.3d 275, and the Supreme Court's decision in *Dillingham*, 519 U.S. 316.  The City contends that the ordinances are equally as remote from ERISA as the substantive training standards in *Associated Builders* and the prevailing wage regulations in *Dillingham*. The City further points out that the apprenticeship requirements are not uniformly applicable to all employers and instead are applicable only to one category of construction projects, which provides employers with a choice as to whether to adopt the apprenticeship standards required for bidding on those contracts.  According to the City, the apprenticeship requirements fall within its general police powers, promote public safety and welfare, and treat ERISA and non-ERISA plans equally such that they cannot be preempted by ERISA.

Upon review, the Court concludes that ACI has made its preliminary showing that Section 320-5 relates to an ERISA plan.

### b. "References"

The present record does not show it is likely that the apprenticeship requirements "reference" an ERISA plan. The plain language of Section 320-5 does not distinguish between ERISA and non-ERISA apprenticeship programs. *See Dillingham*, 519 U.S. at 326-28 (recognizing that because the apprenticeship programs could be maintained by a single employer and their costs deferred out of that employer's general assets, the law did not "reference" ERISA plan). ACI's contention that Section 320-5 essentially requires that ACI join the union's apprenticeship program bears some weight, but that consideration is evaluated below instead given the lack of a plain indication in the language of Section 320-5 that it excludes all programs except the union apprenticeship program. *See id.* (recognizing that if the law acted to apply the lower wage only to apprenticeship programs sponsored by the collective efforts of management and organized labor, the "reference to" argument would have been more persuasive). Thus, ACI has not made a preliminary showing of success on this basis.

### c. "Connection with"

The record presented makes a preliminary showing that Section 320-5 has a "connection with" an ERISA plan. On the first inquiry, ACI has sufficiently demonstrated that Section 320-5 "mandates something" of bidders who seek to obtain a construction contract with the City in the amount of $400,000 or more – namely, that bidders maintain and participate in an apprenticeship program that satisfies the graduation requirement. *See Associated Builders*, 543 F.3d at 282 (finding ratio and equivalency requirements in statute "plainly contain mandates").[5]

---

[5] While the "mandate" is not a state-wide mandate applicable to all contractors as in *Associated Builders*, it nevertheless requires something of those that bid on the City contracts at issue.

8

While it is a closer call as to whether Section 320-5 is the type of law that ERISA intended to preempt, the questions raised are sufficiently serious, substantial, and difficult so as to satisfy the preliminary burden. Two district courts that have addressed issues similar to the one presented here have indicated that the laws may be preempted by ERISA. In *Rack & Balleauer Excavating Co.*, No. 1:13-cv-30, 2013 U.S. Dist. LEXIS 17317, at *11 (S.D. Ohio Feb. 8, 2013), the district court determined that the plaintiff had presented "fairly convincing" evidence that the apprenticeship requirement, among others, of the former version of the City's RBO was preempted by ERISA. That issue, however, was considered on a temporary restraining order. That decision thus is instructive, but not conclusive, here. Similarly, in *Fall River*, 2011 U.S. Dist. LEXIS 114333, the district court found a law that contained an apprenticeship provision that required two graduates per year for three years was preempted by ERISA. While that case is analogous to the situation presented here, the decision relies on a case from the Eighth Circuit, *Minnesota Chapter of Associated Builders & Contractors, Inc. v. Minnesota Department of Public Safety*, 267 F.3d 807 (8th Cir. 2001), that the Sixth Circuit declined to follow and distinguished in its decision concerning apprenticeship standards and training in *Associated Builders*, 543 F.3d at 285. That decision therefore is not afforded significant weight.

The Sixth Circuit's decision in *Associated Builders* that addresses a Michigan law containing two requirements for apprenticeship programs provides guidance in this action. 543 F.3d at 282-84. One of the laws required a one-to-one ratio between trained electricians and apprentice electricians at all work sites, while the second law established an "equivalency requirement" that meant that individuals could be certified in an apprenticeship training program only if the program met some of the apprenticeship training requirements imposed by the U.S. Department of Labor Bureau of Apprenticeship and Training. *Id.* at 277, 282. Considering

*Dillingham* and other cases, the *Associated Builders* court determined that the two Michigan laws did not have a connection with ERISA. *Id.* at 281-85.[6] Although the ratio and equivalency rules "plainly" contained mandates and not merely incentives, the rules did not mandate something that falls within the scope of issues that ERISA prohibits the States from regulating. *Id.* at 282. In reaching that conclusion, the Sixth Circuit found, among other things, that apprenticeship standards and training fell within the traditional police powers of the States, that the policies underlying the ratio and equivalency rules – safety of electrical apprentices and appropriate standards of electrical apprenticeship – were "'quite remote from the areas with which ERISA is expressly concerned,'" that the laws concerned substantive training standards rather than matters directly related to a fund that would trigger the potential application of ERISA to the laws, that the adoption of some of the federal rules would have a tendency to further nationwide uniformity rather than undermine it, and that holding otherwise would allow a slew of laws of general applicability to be preempted. *Id.* at 283.

With that caselaw in mind, the Court first considers whether the City's apprenticeship requirement would fall within the traditional police powers of the State. *Travelers*, 514 U.S. at 654-55; *Associated Builders,* 543 F.3d at 282. Section 320-5 concerns apprenticeship standards that are somewhat similar in kind to those in *Associated Builders*. As recognized by the Sixth Circuit, apprenticeship standards and training is an area that traditionally has fallen within the police powers of the States and should be entitled to the presumption against ERISA preemption. *Associated Builders*, 543 F.3d at 282. Of note, however, is that the City's apprenticeship requirement is contained in a local ordinance rather than in a state law. That local ordinance differs from the state law covering the same subject. Whereas the local law requires a bidder to maintain an apprenticeship program, the State law governing labor and industry apprenticeship

---

[6] The parties did not dispute the "reference to" aspect of ERISA preemption. *Associated Builders*, 543 F.3d at 281.

provides that the participation in apprenticeship programs "shall be entirely on a voluntary basis." *Compare* CMC 320-5 *with* Ohio Rev. Code § 4139.06. The powers of the municipality provided for in Article XVIII, section 3 of the Ohio Constitution only extend so far as to grant authority to exercise "all powers of local self-government and to adopt and enforce within their limits such local police, sanitary, and other similar regulations, *as are not in conflict with general laws.*" (emphasis added). As some conflict seems to exist between State and local law, the entity with which the power is vested is not clear.

The Court turns now to the purposes of ERISA preemption. By enacting the ERISA preemption provision, Congress intended "to avoid conflicting federal and state regulation and to create a nationally uniform administration of employee benefit plans." *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 698 (6th Cir. 2005). Consistent with that purpose, ERISA has been found to preempt state laws that "mandate employee benefit structures or their administration"; provide "alternate enforcement mechanisms"; and "bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself." *Id.* (internal quotations omitted).

Here, the provision may impact the uniformity of the structure and administrative practice for ERISA plans, which is an area with which ERISA is concerned. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9-10 (1987). Section 320-5 does not, as ACI initially contended, mandate a five-year program. Instead, Section 320-5 specifies a success rate of one graduate per year for each of the past five years. That requirement has two potential effects on uniformity. The first effect is to act as a time bar to programs of lesser duration. Some programs may be barred for a minimum of two years and potentially more given Ohio's statutory provision

indicating participation in apprenticeship programs is entirely voluntary.[7] That time bar may curtail the actual choices the employers have for their apprenticeship programs, particularly considering ACI's assertion that only the union apprenticeship program satisfied the graduation requirement. The second effect of Section 320-5 is to effectively require a minimum number of apprentices in the apprenticeship program. A law that specifies a minimum benefit level implicates ERISA concerns. *See Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 193 (4th Cir. 2007).[8]

The law by its nature, however, does not necessarily bind contractors to the graduation requirement. Section 320-5 applies only to those contractors that choose to bid on the City's construction contracts valued at or in excess of $400,000. Whether or to what extent such projects valued below that level exist is not clear. A contractor also could choose not to work on the City construction contracts at all. In that sense, the provision could provide an incentive for contractors to adopt an apprenticeship program that satisfies the graduation requirement, and its only current option may be the union apprenticeship program.

But even when a law "provides a route by which ERISA plans can avoid the state law's requirements, taking that route might still be too disruptive of uniform plan administration to avoid preemption." *Retail Indus. Leaders Ass'n*, 475 F.3d at 193 (citing *Egelhoff v. Egelhoff*, 532 U.S. 141, 151 (2001)). That may be the case here. The City's apprenticeship requirement requires the adoption of a local standard that is in conflict with the State law and that may not be able to be applied uniformly even locally.[9] Additionally, the requirements in Section 320-5 may

---

[7] ACI has indicated that at least some of it members have a program of three years.

[8] Unlike in *Associated Builders*, it is not clear how these provisions would promote workplace safety or otherwise regulate the substantive standards for the day-to-day training.

[9] The recent decision in *United States v. Board of Hamilton County Comm'rs*, No. 1:02-cv-107, 2014 U.S. Dist. LEXIS 87952 (S.D. Ohio June 26, 2014), precludes enforcement of Chapter 320, including its apprenticeship

not be readily adoptable by employers. As previously explained, the standard may act to bar those contractors with non-union apprenticeship programs from obtaining the City's valuable construction contracts for a not insignificant period of time. It is not clear how accessible such apprenticeship program is to other contractors that desire to join. The inability to readily join such a program would curtail the availability of the program to contractors that seek to obtain an award of the City's construction contracts. As such, the apprenticeship requirements are more restrictive and exclusive than those in *Dillingham* where employers were permitted to compete regardless of which option they chose for their ERISA plans, even though the costs of competing were dependent upon the option chosen. 519 U.S. at 332-34.

In light of that analysis, the Court is unable to determine conclusively whether ERISA preempts the apprenticeship regulations in the absence of additional evidence. At this stage, however, ACI has made the requisite preliminary showing to satisfy its burden.

### 2. <u>Two of the factors in determination of lowest and best bidder (CMC 320-3(j) and (k))</u>

#### a. <u>Overview of parties' arguments</u>

ACI contends that the lowest-and-best bidder requirements in Sections 320-3(j) and (k) are preempted by ERISA for three primary reasons: 1) they mandate the reporting of the existence of a health or pension plan, an area with which ERISA is expressly concerned, 2) they effectively mandate that employers establish qualifying health care plans and retirement plans, and 3) they mandate that the contribution be made as part of the employees' regular compensation.

---

requirements, for sewer projects. According to that decision, the City must follow the County's rules, regulations, and resolutions and Ohio state law in procuring Consent Decree sewer projects both within and outside the City's boundaries. *Id.* at *54.

The City opposes ACI's arguments on three primary bases:  1) Section 320-3 does not require the provision of health care or retirement plans, 2) Sections 320-3(j) and (k) narrowly apply only to those bidders or contractors with a gross revenue of more than $2 million over any of the three preceding tax years, and 3) the requirements are not those with which ERISA is concerned and are at least as remote from ERISA's regulatory scheme as the laws upheld in *Associated Builders* and *Dillingham.*

Upon review, the Court finds ACI has made a preliminary showing that Sections 320-3(j) and (k) relate to an ERISA plan.

### b.  "References"

The record is unclear as to whether the provisions likely "reference" an ERISA plan. Although Sections 320-3(j) and (k) do not mention ERISA specifically or make a plain distinction between those benefit schemes that are funded by general assets and separate funds, there is a strong indication that the City is interested in whether employers maintain ERISA-covered plans.  Included within its scope are a "health care plan" and a "pension or retirement program" such as a "401k" or "defined benefit plan" or a "similar plan."  Those plans and programs fall within the type of employee benefit plans to which ERISA applies.  The provision also indicates that the employer is to "provide" or "contribute" to those plans so as to suggest the plans that are of interest to the City are those that are employer-sponsored.  Further suggesting that the plans and programs of interest to the City are those covered by ERISA is the indication that the plans and programs are to come from "regular compensation."  Although the ordinary usage of "regular compensation" is separate and distinct from the funding source, it concerns the ongoing nature of the administrative scheme. *See Fort Halifax*, 482 U.S. at 11.

Nevertheless, while the City may be interested in ERISA plans, the language of Sections 320-3(j) and (k) does not appear to treat ERISA and non-ERISA plans any differently.  *See Dillingham*, 519 U.S. at 325.  Regardless of whether an employer provides an ERISA plan, a non-ERISA plan, or no plan at all, it is required to make the certification as to *whether* it maintains a health care plan and pension or retirement plan as set forth in those provisions.  That certification then is used as one of multiple factors in considering the lowest and best bidder.  However, Section 320-3 does provide that the failure to "affirmatively certify" any one of the criteria may constitute evidence that the bid is not the lowest and best.  CMC 320-3.  That language may indicate that a contractor who cannot show the existence of the requisite "health care plan" or "pension or retirement program" as set forth in Sections 320-3(j) and (k) will be disqualified.

The "regular compensation" requirement of the provisions also potentially could act directly on the structure or administration of an ERISA plan.  The term "regular compensation" is not defined in the RBO and, thus, its impact on an ERISA plan is unclear.  In an ordinary sense, the term "regular compensation" could concern the ongoing nature of an administrative scheme.  *See Fort Halifax*, 482 U.S. at 11 (recognizing that ERISA concerns "benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation").  It may also very well implicate concerns as to the benefit levels that are relevant to the structure and administration of the ERISA plan.

The ambiguities in the language utilized, however, make it difficult to determine without additional discovery the precise effects upon the plan itself.  As the "reference to" requirement generally has been applied when the court has been able to readily find a direct impact on the ERISA plan from the plain language of the law, it is not certain that the provision satisfies the

"reference to" inquiry. *See District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 130 (1992) (law "referenced" ERISA when it expressly identified a ERISA-covered plan and specifically imposed requirements as to the benefit level of that plan); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990) (success on common law wrongful discharge claim required proof that employer did not want to make the required contributions and disbursements from pension fund); *Mackey v. Lanier Collection Agency & Serv.*, 486 U.S. 825, 828-29 (1988) (law "referenced" an ERISA plan when it expressly mentioned ERISA and by its language acted on ERISA plans differently from non-ERISA plans by exempting only ERISA plans from garnishment).

### c. "Connection with"

ACI has, however, made a preliminary showing that Sections 320(j) and (k) may have a connection with an ERISA plan.

Sections 320(j) and (k) plainly "mandate something." Specifically, they mandate that the contractor with gross revenues of more than $2 million over the three preceding years certify that it makes contributions to a health plan and pension or retirement plan as part of the regular compensation of the employees. *See Associated Builders*, 543 F.3d at 282.[10] ACI also has made a preliminary showing that the reporting requirement in practice "effectively mandates" the establishment or maintenance of an ERISA plan out of the regular compensation of the employer and that those contractors who do not have such plans cannot qualify for the award of the construction contracts. As explained above, the terminology of the provision itself is unclear but could suggest an application of the provision that rises to the level of a mandate. ACI also has presented additional support for that position. In particular, ACI has shown that the former RBO

---

[10] While the "mandate" is not a state-wide mandate applicable to all contractors as in *Associated Builders*, it nevertheless requires something of those that bid on the City contracts at issue and that satisfy the threshold gross revenue requirement. Those who satisfy that requirement must comply with the provisions.

provision differed only in that it required certification "that" instead of "whether" the employer maintained health care plans and pension or retirement programs for its employees.   ACI contends that the actual enforcement of the current provision is no different than it was under the former RBO, and it points out that the *Rack & Balleauer Excavating* court indicated the former provision may be preempted by ERISA.   ACI further points to the fact that Prus and Hartman & Smith did not obtain contracts on which they were the lowest bidders and were informed that their bids were unresponsive.   While ACI does not specify whether either ACI member was required to make the certification or how either ACI member responded to the certification requirements, the Court finds the evidence presented sufficient to make a preliminary showing on this first inquiry. The question then is whether the reporting and disclosure of the existence of a plan falls within the areas ERISA is intended to control exclusively so as to be preempted.

There are two aspects of Sections 320-3(j) and (k) that must be considered under that second inquiry: the reporting/disclosure requirement and the "regular compensation" requirement.   As stated previously, ERISA is concerned with the uniformity in the structure and administration of employee benefit plans.   One area in particular to which the concern extends is reporting and disclosure. *Dillingham*, 519 U.S. at 330 (indicating that the areas with which ERISA is expressly concerned include "'reporting, disclosure, fiduciary responsibility, and the like'") (quoting *Travelers*, 514 U.S. at 661).   A provision is not preempted by ERISA, however, whenever it contains some type of reporting or disclosure requirement.   The Court must also consider the objectives of ERISA and the effect of the requirements on an ERISA plan.

The reporting and disclosure requirements of ERISA stemmed from a concern about the "mismanagement of funds accumulated to finance employee benefits and the failure to pay employees['] benefits from accumulated funds."   *Dillingham*, 519 U.S. at 326-27 (quoting

*Massachusetts v. Morash*, 490 U.S. 107, 115 (1989)). Along with other requirements, the reporting and disclosure requirements of ERISA were established "'to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator.'" *Id.* (quoting *Morash*, 490 U.S. at 115). Viewing that concern together with the detailed reporting and disclosure obligations set forth in ERISA, it is apparent that the financial security of the plan participants and beneficiaries is a primary aim of the reporting and disclosure requirements. *See* 29 U.S.C. § 1021(a), (b); *Dillingham*, 519 U.S. at 326-37.

Here, ACI has not shown how the reporting and disclosure requirement itself would affect the financial security of the plan or is in conflict with any reporting or disclosure requirements in ERISA. These requirements thus would appear to be the type of tenuous, remote or peripheral regulations that do not raise ERISA concerns. *See Liberty Mut. Ins. Co. v. Donegan*, 746 F.3d 497, 507-08 (2d Cir. 2014) (recognizing that state reporting requirements may withstand preemption when they impose no particular form of record-keeping, create burdens so slight as to create no impediment to uniform benefit administration, and seek information readily obtainable from the employer).

Yet, the provisions also may effectively mandate that an employer maintain or establish a plan or program and that the contribution to that plan or program be part of the employees' regular compensation. While the term "regular compensation" is not defined in the ordinance, the manner in which that requirement is applied could affect the level of benefits offered or how benefit are calculated or disbursed. Although further discovery is necessary to make that determination, the Court finds that ACI has made a sufficient preliminary showing to warrant further investigation.

Given the above analysis, the Court concludes that ACI has met its preliminary burden as to Sections 320-3(j) and (k).

### 3. Pre-apprenticeship training fund (CMC 320-7)

#### a. Overview of parties' arguments

ACI contends that the pre-apprenticeship training fund provisions of Section 320-7 are preempted by ERISA because they require contractors to pay $.10 per hour per worker into an MSDGC Fund 701 or Water Works Fund 101 for a pre-apprenticeship program, which are separate funds to support qualified pre-apprenticeship programs.  ACI argues that requiring contractors to contribute to that separate fund triggers ERISA preemption.  ACI also argues that the additional requirement that the payments "not be taken from the fringe benefits of the contractor's employees" dictates how such plans are paid for by the contractor and that the City "has no business telling employers how much they must pay into fringe benefit funds which are covered by ERISA."  (Doc. 11, p. 122).

The City opposes ACI's arguments, arguing that the pre-apprenticeship training fund does not relate to an employee benefit plan because it is not an ERISA-regulated plan.  Rather, the City claims that the fund is established and maintained by the City for purposes set by the City. The City also appears to argue that the provision is at least as remote from ERISA's regulatory scheme as the laws upheld in *Associated Builders* and *Dillingham*.

Upon review, the Court finds ACI has made a preliminary showing that Section 320-3(j) and (k) relates to an ERISA plan.

#### b. "References"

On the present record, a preliminary showing has not been made that Section 320-7 "references" an ERISA plan.  While Section 320-7 indicates that a payment is to be made by the

employer into a separate fund, there is no evidence presented that the fund is established or maintained by the contributing employer or an employee organization so as to qualify as an employee benefit plan covered by ERISA.  29 U.S.C. § 1002(1).  Moreover, the ordinary use of the term "fringe benefits" applies equally to ERISA and non-ERISA benefits.[11]  Thus, the Court cannot conclude at this time that ACI is likely to succeed on this basis.

### c.  "Connection with"

Determining whether the payment has the requisite connection with an ERISA plan is a fact-specific inquiry.  While there is factual support for both ACI's and the City's position, the Court finds ACI has made the requisite preliminary showing.

Section 320-7 plainly "mandates something" – namely, the contractor's payment of a specified amount into the fund as well as the manner in which that payment to the fund shall be made.[12]  The remaining question is whether the mandate relates to something that ERISA intended to preempt.

As explained previously, Congress is concerned with the mismanagement of funds accumulated to finance employee benefits.  *Dillingham*, 519 U.S. at 326-27 (citing *Morash*, 490 U.S. at 115).  By its own language, Section 320-7 is intended to accumulate funds to support qualified pre-apprenticeship programs.  As indicated above, however, ACI has not shown that the City falls within those entities with which Congress was expressly concerned.  That, however, does not necessarily mean that Section 320-7 cannot be preempted.

---

[11] The Affidavit of Terry Phillips submitted by ACI supports a finding that "fringe benefits" are not exclusively ERISA-covered plans.  (Doc. 12-1, p. 150) (setting forth various types of fringe benefits provided by its members and indicating that "[*m]any* of these benefit programs are regulated by ERISA").

[12] As with the other provisions, this provision does not apply to all employers in the city or state.  It applies only to those bidders that are awarded construction contracts by the City.

Section 320-7's requirement that the employer not make the payment out of fringe benefits appears to be backdoor way of dictating the level of benefit provided by the employer. In effect, that requirement may preclude the employer from reducing or otherwise changing the level of benefit offered to its employees while mandating a specified rate of additional cost for the benefit. To that end, the requirement would affect the structure and administration of an ERISA plan.

Moreover, if an employer was required by law to make a payment directly to a specified benefit program out of funds other than its fringe benefits, it could face a quandary. Not only could the provided benefit be duplicative of a benefit the employer already provides, but integrating that benefit into an already-established ERISA plan would present obstacles given the potential funding discrepancies. *Fort Halifax*, 482 U.S. at 13-15. That is precisely the harm that ERISA seeks to avoid. It is not apparent that using the City as a conduit to accomplish what the employer would not do on its own resolves the conflict and avoids ERISA preemption.

The fact that the payment is involuntary and at a specified rate presents additional concerns about the impact of the provision on the structure and administration of existing ERISA plans. Unlike in *Dillingham*, the employers are not presented with a choice between adopting a structure and obtaining an economic incentive or not adopting the structure and losing out on an economic incentive. Section 320-7 instead makes that choice for the contractor. While a contractor could avoid the requirement by choosing not to accept an award of the City's contract, the same issue would exist for each and every contractor that accepted the contract award. The type of choice and economic incentive referenced in *Dillingham* thus is not existent here.

Given this analysis, the Court finds that ACI has made the requisite preliminary showing with respect to Section 320-7.

4. **Market participant**

The City argues that the RBO avoids preemption because the City was acting as a market participant in adopting the provisions. It contends that the Supreme Court's preemptive provision was to "establish the *regulation* of employee welfare benefit *plans* as exclusively a federal concern." (Doc. 10, p. 98) (quoting *Travelers*, 514 U.S. at 655). It argues that the City acted as a purchaser of goods and services in the marketplace through the ordinances and was acting as a contractor rather than a regulator.

ACI disagrees. It points out the conflicting arguments of the City. On one hand, the City claims it is acting as a market participant as a contractor for construction services while, on the other hand, it is arguing the RBO is a proper exercise of municipal authority under its Charter, the Ohio Constitution and other Ohio law. ACI contends that the mandates in the RBO are tantamount to regulation such that the market participation doctrine is inapplicable.

At this stage, the Court cannot find that the market participant doctrine would bar ACI's preemption claims. This case is distinguishable from *Building & Construction Trades Council v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218 (1993) ("*Boston Harbor*"). In *Boston Harbor*, the independent government agency was tasked with cleaning up the Boston Harbor. It hired an engineering company that served as the project manager. The engineering company then negotiated a contract with the contractors that required a project labor agreement. The Court held that the project labor agreement was not preempted by the NLRA because the agency acted as a market participant rather than as a government regulator. In reaching that conclusion, the Court noted various distinctions between market participants and government regulators. Among those distinctions were that the State was acting as "a market participant with

no interest in setting policy" and was performing a private role rather than a characteristically governmental role.

Here, the record suggests that the City acted in what is "characteristically" a governmental role when it adopted the RBO provisions at issue. Those provisions of the RBO do not appear to be aimed solely and neutrally at protecting the City's private interests in the efficient use of its resources. Rather, it appears to reach further to control the way in which contractors generally conduct their businesses. To that end, the RBO provisions at issue may be a tool to promote a labor policy rather than the City's proprietary interests. The City's conduct thus appears to be distinguishable from the type of proprietary conduct at issue in *Boston Harbor*.

### 5. **Fitzgerald Act**

The City further contends that the RBO is saved from preemption because it implements another federal law, the National Apprenticeship Act of 1937 ("Fitzgerald Act"), 29 U.S.C. § 50. The City argues that the preemption of the City's RBO would frustrate and impair the federal-state scheme envisioned by Congress for the regulation of apprenticeship. It claims the RBO advances the Fitzgerald Act's purpose by addressing the lack of a skilled labor force, and creating benefits such as increased career opportunities for workers financed by the contractors that undertake public improvement projects.

ACI again disagrees that the City can avoid ERISA preemption. It contends that the Fitzgerald Act is concerned with the safety of apprentices and the standards of apprenticeship, and the RBO provisions deal with neither, providing instead graduation requirements, certification requirements for health care plans and retirement programs, and funding mechanisms for pre-apprenticeship programs.

23

The Court does not find that the RBO conclusively avoids ERISA preemption by implementing the Fitzgerald Act.  ERISA limits preemption by providing that:

> Nothing in this title shall be construed to alter, amend, modify, invalidate, impair or supersede any law of the United States (except as provided in [29 U.S.C. §§ 1031, 1137(b)] or any rule or regulation issued under such law.

29 U.S.C. § 1441(d).  The Fitzgerald Act is a federal law that authorizes and directs the Secretary of Labor to:

> formulate and promote the furtherance of labor standards necessary to safeguard the welfare of apprentices, to extend the application of such standards by encouraging the inclusion thereof in contracts of apprenticeship, to bring together employers and labor for the formulation of programs of apprenticeship, [and] to cooperate with State agencies engaged in the formulation and promotion of standards of apprenticeship. . . .

29 U.S.C. § 50.  The policy concerns standards for federal registration of apprenticeship programs.  *See* 29 C.F.R. § 29.1. In regards to ERISA preemption of state apprenticeship standards, the Sixth Circuit has stated that the authorization to cooperate with State agencies in those matters "undermines any suggestion that Congress sees no role for the States in regulating apprenticeship safety." *Associated Builders*, 543 F.3d at 283.

Here, it is not clear that ERISA preemption would impair the Fitzgerald Act or its purposes.  As indicated above, the adoption of apprenticeship standards falls within the traditional state police powers state and is not necessarily derived from the Fitzgerald Act. Moreover, the apprenticeship requirement conflicts to some degree with the State standard and does not incorporate specific national standards of apprenticeship so as to promote national uniformity rather than undermine it.  *Associated Builders*, 543 F.3d at 283 (holding that the Fitzgerald Act "specifically allows and encourages what Michigan has done—most notably its adoption of some of the federal rules, a policy choice that generally will have a tendency to further nationwide uniformity rather than undermine it").  Instead, it goes beyond or is separate

from those national standards. While the graduation requirement may fall within the broad class of apprenticeship standards that States are encouraged to adopt, only a loose and non-specific connection to safety has been shown through Ordinance No. 114-2013. (Doc. 10-1, p. 106). Likewise, only the same loose and non-specific connection has been shown to exist between apprenticeship safety and health care plans, retirement plans, and the pre-apprenticeship fund. (*See id.*)[13] Thus, the Court cannot conclude at this time that the Fitzgerald Act would be altered or impaired by ERISA preemption of the three RBO provisions at issue.

### B.  Irreparable Harm and Substantial Harm to Others

With respect to the second and third Rule 65 factors, the balance of equities tips in favor of ACI.

As the Sixth Circuit has explained, "[a] plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (internal quotations omitted). "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make the damages difficult to calculate." *Id.* (internal quotations omitted).

The City argues that any injury ACI would suffer in the absence of the injunction could be compensated by money damages. ACI has identified, however, several injuries for which money damages are inadequate. In the absence of a preliminary injunction, ACI members could lose work as well as the opportunity to meaningfully compete for contracts. Those harms are not quantifiable. *Johnson v. City of Memphis*, 444 F. App'x 856, 860 (6th Cir. 2011) (recognizing in the employment context that lost work experience and the opportunity to compete for promotions

---

[13] The plain language of Section 320-7 makes no mention of safety standards for apprenticeship programs. Instead, its stated purpose is to "create a pipeline of opportunities from recruitment to procurement to retention." CMC 320-7.

are harms that are not easily valued); *see also PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003) ("This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm."); *Glenwood Bridge, Inc. v. Minneapolis*, 940 F.2d 367, 371-72 (8th Cir. 1991) (recognizing that loss of opportunity to meaningfully participate in bidding process may constitute irreparable harm). In the event a permanent injunction eventually issues, the pending contracts already would be awarded and the preparations and work already will have commenced. A permanent injunction thus would be inadequate to address the harms that have been raised in this matter.

As for the harm to others, the City, its residents, and those contractors that would otherwise be awarded the construction contracts could be harmed by the delay in awarding the pending construction contracts that would result from the issuance of the injunction. That harm could be avoided, however, by awarding contracts without enforcing the RBO requirements that are at issue here, even though it is possible that different harms may result from doing so.

### C. **Public Interest**

The fourth Rule 65 factor weighs in favor of ACI. The City contends that the public interest is not served by the issuance of the injunction because it would usurp the City's judgment as to the standards for awarding contracts for its projects. While some deference should be given to that judgment, the public interest in promoting fair competition and low costs for taxpayers that would be served by injunctive relief bears more weight.

## IV. **CONCLUSION**

Balancing the equities, the Court concludes that a preliminary injunction is warranted. Not only has ACI made a preliminary showing on the claims concerning CMC 320-3(j) and (k), CMC 320-5 and CMC 320-7, but it also has shown that the irreparable harm and the public

interest factors weigh in favor of preliminary injunctive relief. Accordingly, ACI's Motion (Doc. 2) is **GRANTED**, and the City is hereby **PRELIMINARILY ENJOINED** from enforcing CMC 320-3(j) and (k), CMC 320-5, and CMC 320-7 in connection with the pending Mohawk Project, the pending Ludlow Project, and other pending or future water works construction projects for which contracts have not been awarded.

Bond is set at $1 million.

**IT IS SO ORDERED**.

s/Michael R. Barrett
MICHAEL R. BARRETT, JUDGE
UNITED STATES DISTRICT COURT