# Expert Report
# of Dale Belman, Ph.D

# Exhibit IX-1



# EPI BRIEFING PAPER

ECONOMIC POLICY INSTITUTE ◼ AUGUST 11, 2010 ◼ BRIEFING PAPER #274

# BUILDING BETTER
## A Look at Best Practices for the Design of Project Labor Agreements

BY **DALE BELMAN** (MICHIGAN STATE UNIVERSITY, SCHOOL OF LABOR AND INDUSTRIAL RELATIONS) AND **MATTHEW M. BODAH** (UNIVERSITY OF RHODE ISLAND, SCHMIDT LABOR RESEARCH CENTER)

## Executive summary

Project labor agreements (PLAs) are a type of contract used in the construction industry to set the terms and conditions of employment on large projects of long duration and design complexity. PLAs allow the expeditious resolution of disputes that can arise in the course of the project, thereby helping to ensure that the project is delivered on time and that quality standards are maintained. Recently, PLAs have begun to include provisions that seek to improve conditions on the worksite (e.g., health and safety rules) and provide benefits to the community by including jobs and training opportunities for disadvantaged workers and carve-outs for small or minority-owned businesses.

Although PLAs have been around for years and used on some of the most famous construction projects in American history, their use has become controversial as the nonunion sector of the construction industry has grown and as PLAs have been applied to relatively small projects. Critics argue that PLAs place nonunion contractors at a disadvantage in bidding on projects and raise overall project costs. PLA opponents are particularly critical of the use of PLAs on public projects. They argue that such usage violates the spirit of public bidding statutes by requiring the adherence to collectively bargained terms and conditions of employment as a prerequisite for winning a contract.

**TABLE OF CONTENTS**

Executive summary ............................................................. 1

Introduction.......................................................................... 2

The construction industry ................................................ 4

Designing PLAs to meet project deadlines and quality standards ............................................................................. 6

Designing PLAs to improve efficiency and encourage innovation ............................................................................. 10

Designing PLAs to support communities ...................... 15

Designing PLAs to improve safety and health .............. 22

Designing PLAs to resolve disputes................................ 27

Designing PLAs to deal with nonunion contractors ...... 31

Negotiating PLAs ............................................................. 37

Conclusion.......................................................................... 42

www.epi.org

If designed properly, PLAs can help projects meet deadlines by guaranteeing a steady supply of highly skilled labor through the building and construction trades unions' nationwide network of referral systems and by reconciling the various work routines of the many trades. PLAs also help to assure timely completion by keeping projects free from disruptions resulting from local labor disputes, grievances, or jurisdictional issues.

PLAs can improve efficiency and promote innovation by prohibiting restrictive work norms, by improving coordination in work flow, and by supporting experiments in changing the work environment. In addition, many PLAs include highly developed systems of labor/management cooperation.

Language in PLAs can be written to advance important policy goals, such as improving training and recruiting members of disadvantaged communities into high-paying jobs in construction.

Often PLAs, particularly those on large projects, contain sophisticated health and safety provisions, including those that dictate overall safety practices, create safety committees, mandate safety training and safety meetings, and address such matters as drug screening.

While nonunion contractors are the most vocal PLA opponents, many PLAs accommodate nonunion firms by, among other things, prohibiting discrimination in bidding based on union status and allowing nonunion firms to bring at least certain core workers with them to projects. Evidence suggests that, where they have attempted to gain PLA work, nonunion firms have been successful in competing for it.

One successful method that is used in many parts of the country for negotiating PLAs is their development by local labor/management councils. Such groups can use the AFL-CIO Building and Construction Trade Department's model PLA and include language to accommodate local concerns. A local model PLA can then be fashioned on a job-by-job basis to meet the needs of the owners and community groups that might have a stake in a project.

We hope that this report can move the PLA discussion beyond a debate about whether PLAs are good or bad and toward a more constructive discussion regarding how to create PLAs that help deliver better projects for owners, contractors, workers, and communities.

# Introduction

## *What is a project labor agreement?*

The construction of major projects such as highways, bridges, and power grids entails the careful coordination of large numbers of individual contractors and their workforces, often under demanding time schedules and design specifications. Failure to meet project deadlines or quality standards can be costly to the businesses and agencies involved and to the public at large. Project labor agreements (PLAs) are a type of contract used in the construction industry to set the terms and conditions of employment on large projects of long duration and design complexity.

The longstanding purpose of PLAs is to resolve expeditiously disputes arising in the course of the project, thereby helping to ensure that the project is delivered on time and that quality standards are maintained. PLAs in more recent years also include provisions that seek to improve conditions on the worksite (e.g., health and safety rules) and provide benefits to the surrounding community (for example, by including jobs and training opportunities for disadvantaged workers).

Two basic design features allow PLAs to meet the twin goals of creating greater uniformity in labor contracts and minimizing disruptions that can occur on major construction projects. First, the typical PLA is negotiated by a local building and construction trades council (BCTC) and a construction management firm with the goal of reconciling the differing provisions found in local labor agreements across the building trades unions. For example, each local union's collective bargaining agreement may have different benefits and premium-pay provisions, different hours-of-work provisions, and different work rules. When many trades are working together on a single project over a long period, it makes sense to reconcile differing contract provisions within a master agreement.

The second fundamental design feature in PLAs offers the construction user—typically called the owner—assurances that work will be undertaken without disruption and that disputes will be resolved expeditiously without causing delays to project schedules. Accordingly, one provision that is nearly universal in PLAs is that work continues on a project no matter what conflicts arise on the project or off. Therefore, even if a building trade union is on strike in a local area, work on a PLA-covered project continues; disputes on the project itself are handled through labor/management committees and grievance procedures culminating in binding arbitration.

Along with these basic elements, PLAs can contain a variety of provisions relating to health and safety practices, training, recruitment of local workers, and operational issues. They may also include favorable language for owners and contractors on compensation and work rules.

## History of PLAs

Although the term is relatively new, PLAs have been around for many years. During World War I, American Federation of Labor President Samuel Gompers and Secretary of War Newton D. Baker agreed that military cantonments would be built under a union pay scale in exchange for the unions giving up a request for a closed shop on such projects (McCartin 1997). During and immediately after World War II, agreements that were particularly popular at atomic energy and space and missile sites provided for uniform shift and overtime rates along with no-strike guarantees (Dunlop 2002). Iconic American projects such as Hoover Dam and the Trans-Alaska Pipeline were built under PLAs.

PLAs continued to be used with little controversy in both the private and public sectors throughout the postwar period—a period during which much of the construction industry was highly unionized. With powerful unions, there was a strong desire on the part of owners and contractors to avoid labor disputes and gain the best economic deal possible relative to local agreements. The climate changed, however, in the 1970s and 1980s, when union market share dropped and construction users and the nonunion sector became better organized (Linder 1999). In the new environment, with large nonunion contractors able to compete for all types of work in most states, and with the growing strength of a nonunion contractors' association—the Associated Builders and Contractors (ABC)—challenges to PLAs became more common. In the past decade, all branches and levels of government have entered the PLA debate (Cockshaw 2003; U.S. Senate 2000).

## Why are PLAs controversial?

Because PLAs require that all contactors working on a project adhere to a collective bargaining agreement, even non-union contractors must operate under negotiated rules. These contractors complain that PLAs remove their competitive advantage, require them to use union workers from hiring halls rather than their own employees, and require them to contribute to union-sector health care and pension funds from which their own employees are unlikely to benefit (ABC 2001). Opponents of PLAs argue that they frequently add costs to projects that benefit only the contractors and workers, not the general public.

Private sector owners may place nearly any conditions they like on their projects; even so, private sector PLAs often restrict bidding to unionized contractors. On public projects, however, state and federal bidding statutes and regulations must be followed. Therefore, much of the controversy surrounding PLAs is whether, on government projects, they violate public bidding statutes by placing a condition on successful bidding (i.e., the willingness to sign a PLA) beyond the requirement of being the "lowest qualified bidder."

As public policy has developed, most courts have held that governments may use PLAs on public projects as long as bidding is open to all qualified bidders (union and nonunion) and due diligence has been done to determine the cost effectiveness of the PLA. On a practical level, this means that the benefits of improved coordination and management offered by the PLA can outweigh any additional costs that might arise from their use. Whether they do depends on the provisions of the PLA and how they are implemented by the parties on the project.

At the federal level, PLAs have been something of a political football. Their use was prohibited on federally funded projects at the end of George H.W. Bush's administration, encouraged during the Clinton administration, essentially prohibited during George W. Bush's administration, and, again, encouraged under the Obama administration (see Executive Order 13502, February 6, 2009). Federal regulations pursuant to the implementation of President Obama's executive order appeared in the Federal Register on April 13, 2010.[1] As evidence of how contentious the issue of PLAs can be, the public comment period on the federal regulations in the fall of 2009 yielded nearly 700 responses, pro and con.

### The purpose of this report

Passions in the PLA debate often eclipse reason. But PLAs should be viewed for precisely what they are: a tool to provide value on construction projects. Because PLAs have many elements, and differ considerably in terms of which elements are used and how they are carried out in practice, an agreement's success at adding value is dependent on design choices and how its provisions are implemented during the project. This report focuses on best practices that have helped parties make the most of their agreements. Accordingly, rather than rehashing the PLA debate, we offer advice on such matters as assuring timely projects, maximizing efficiency and innovation, supporting community development, improving health and safety, resolving disputes, accommodating nonunion contractors, and negotiating PLAs. We hope this report can be used by parties to craft better PLAs and achieve success on their construction projects.

## The construction industry

For convenience we speak of the construction industry, but construction comprises several distinct industries and is organized around occupations rather than employers. Construction projects are temporary, as are most construction jobs. Craft workers and professional employees in the industry move between employers to remain employed, and these continual transitions result in a weak attachment between employers and employees. Demand for construction and, therefore, construction workers is cyclical. In addition, immigrants, as historically has been the case, make up a large and increasing part of the construction labor force. In this section, we will discuss each of these characteristics of the industry.

Even though the construction sector is devoted to building things—except, of course, for those segments that specialize in tearing things down—there are marked differences in the work, technology, financing, and labor forces between industries. Perhaps the most obvious difference is between residential and all other construction. Residential construction firms are typically small, operate in markets with vigorous price competition, and employ workers with less training and fewer skills. But there are also meaningful differences between other parts of construction. For example, highway construction depends on public works expenditures, industrial construction is driven by demand for manufacturers' products, and large commercial projects require capital from banks and outside investors.

The occupational structure of work and the occupational structuring of firms distinguishes construction from other industries. Construction workers are defined by their occupation more so than by their employers. Skill development is specific to a trade—electricians do not have the skills to do the work of carpenters or pipefitters—and once workers have acquired substantial skills within a trade they usually remain in that trade. Moreover, most firms are occupationally structured. They provide a specific type of service, such as electrical contracting, plumbing, pipefitting, painting, or roofing. Even general contractors seldom employ more than the basic trades—for example, carpenters, ironworkers, laborers, operating engineers, and bricklayers—and may obtain even these workers by subcontracting with specialty employers. The occupational structure of construction makes skill development central to the success and efficiency of the industry and supports the easy movement of employees between employers.

Construction is unique among the goods-producing industries in being dominated by small employers and establishments. Although there are well-known large employers such as the Bechtel Group, Bovis Lend Lease, Skanska, and KBR, to name a few, only 15% of all construction workers are employed by contractors with 250 or more employees—about

a quarter (24.4%) work in firms with nine or fewer employees—and of the 710,307 establishments in the construction industry only 163 have 1,000 or more employees (U.S. Census Bureau 2005). The small number of employees in most firms is due to workers being specialized not only by trade but by type of work. Hence, an electrician, for example, may work for a firm that specializes in residential work or industrial work or in the installation on lighting on highways. Except for the very largest firms, construction employers typically operate in local or, at most, regional markets.

Construction projects are inherently temporary. Consequently, a contractor's volume of work and the number of employees it needs vary considerably over time. The workforce has to be mobile between projects, and often between employers. Historically, building trades unions have served as labor market intermediaries that provide a clearinghouse for labor to contractors and serve as a guarantor of the skills of the workforce and conditions for craft workers. In conjunction with signatory (i.e., unionized) employers and their associations, the unions provide training and health and welfare benefits to a mobile labor force. At the same time, however, workforce mobility makes relations between the unions and the employers less stable than in other industries.

The complexities created by the small size of construction employers and the transient nature of construction projects are compounded by the multifaceted organization of construction projects. That is, no single company builds a project. Rather, parts of every project are subcontracted out to firms that specialize in the type of construction needed. A building construction project is likely to involve site preparation, foundations, framing, roofing, electrical work, plumbing, heating and cooling, drywalling, painting, and flooring. In many cases, some or all of these tasks will be contracted to subspecialty firms. As a result, many employers and craft workers will operate—or need to operate—on the same site at the same time. Coordination of multiple contractors is a critical and challenging task, one which, if poorly done, will have negative effects on timeliness and quality. Successful coordination of multiple employers and trades is the hallmark of good projects. However, successful coordination of projects has been complicated during the past several decades as general contracting firms have evolved into construction management firms. Historically, general contractors took overall responsibility for successful completion of a project, and they assumed the financial risks and rewards of that responsibility. In contrast, construction managers serve the owner by coordinating and overseeing the contractors and subcontractors, but they do not take on financial risk if a project goes poorly. The shift from the general contracting to the construction management model complicates lines of authority and incentives.[2] Whatever the management structure of a project, the fundamental complexity of the construction worksite makes coordination across trades and contractors important to the project's success.

The decline of union representation in the construction industry over the past 40 years coincides with an increase in issues related to worker training and a shortage of skilled craft workers. Training highly skilled craft workers requires multi-year programs that combine classroom training and on-the-job experience. In the past, much of the training of construction workers took place in apprenticeship programs overseen by joint labor/management committees. These programs were financed by contractually mandated employer contributions determined by the number of hours worked by a trade. The joint governance structure proved to be effective in providing broad skills training economically. With the large-scale shift to nonunion employment, the apprenticeship system has declined. The lack of large-scale training systems in the nonunion sector was not an issue for many years because many of its workers had been trained in joint apprenticeship programs. Over the past 20 years, however, the lack of effective training systems in the nonunion sector has increasingly affected the ability to deliver high-quality projects. Thus, training has become an issue for construction stakeholders.[3]

Because the construction industry is very sensitive to demand conditions and changes in interest rates, construction workers face higher and more volatile unemployment than workers in the balance of the economy. For example, the nation's overall annual unemployment rate ranged from 4% to 6% between 2000 and 2007, while the rate in the construction industry was 6.2% to 9.3%.[4] Monthly rates show even greater variability. The average difference in the high and low monthly unemployment rate in these years was only 1.05% for unemployment overall, while the figure

for the construction industry was 5.88%, or over five times higher.[5] Another example can be found in recent unemployment rates. While the national unemployment rate was 9.5% in June 2010, the unemployment rate in construction was 20.1%.[6]

Construction has been and continues to be a port of entry into the labor force for immigrant workers. Just as large numbers of immigrants from Ireland, Italy, and Central Europe once entered construction soon after entering the United States, construction has more recently served as an important source of employment for new immigrants from Central and South America. Research by the Pew Hispanic Center found that, in 2006, 75% of Hispanics employed in construction were foreign born. Between 2003 and 2006, Hispanic employment in construction rose from 11% to 15% of total employment and provided 40% of the increase in employment among Hispanics during that period (Pew Hispanic Center 2006). The influx of immigrant labor provided an important support for the housing boom of the early 2000s, but may have exacerbated problems with earnings and employment conditions, particularly in residential construction.[7]

Understanding these distinctive characteristics of construction helps us to understand why and how PLAs can be used to deal with complexity on large projects of long duration. PLAs can control some of the uncertainty in an otherwise diverse and decentralized industry.

## Designing PLAs to meet project deadlines and quality standards

PLAs can be an effective tool for ensuring that projects are completed on time. Delays create inconveniences and costs for everyone. The school that is not ready for the first day of the new year may force the use of temporary and overcrowded facilities and necessitate a mid-year move. The highway that is not completed on time continues to cause travel problems for commuters and truckers, which result in real costs to a local economy. The factory that is not finished cannot produce revenue for its owners. Moreover, project delays impose additional costs for borrowers and are often the root causes of construction litigation.

Delays in construction projects are not unusual and have many sources. Sometimes, they are related to inadequate numbers of available and appropriately skilled workers. They may also be caused by weather, by materials being lost on the site or arriving late, by problems associated with financing or insufficient planning, or by the unavailability of contractors at the time when their services are needed. Although no one project may suffer delays from all of these sources, delays are common in construction, and timely completion of a project often requires adjustments to work schedules and labor requirements to bring it back on schedule.

Interviews we have conducted with more than one hundred individuals involved in various aspects of construction—e.g., owners, contractors, contractors' association staff, and union officials—on scores of projects[8] reveal broad satisfaction with the ability of PLAs to assure timely completion. Where delays were experienced, they were usually unrelated to labor issues.[9] In fact, the anecdotal evidence suggests that some projects would have experienced schedule delays were it not for the interventions made possible in the PLA.[10] For example, there were instances in which remaining on schedule required bringing in out-of-area workers at critical points in projects. Absent the local unions' commitment in the PLA to providing labor on a timely basis, it is likely that the local unions would have been far less willing to give up work for their members.

PLAs act to improve timeliness through several mechanisms. First, all PLAs include provisions that commit the local unions to provide labor on a timely basis, usually within 48 hours. This commitment is supported by arrangements between union locals to facilitate the movement of skilled labor to areas of labor shortage. Second, most PLAs proscribe work disruptions—strikes, slowdowns, wobbles, and other labor actions—and provide mechanisms by which disputes can be anticipated and peacefully resolved. The presence of these bans, and the provision of dispute resolution mechanisms, supports timeliness both by removing many of the causes of disruptions and by emphasizing the importance of timeliness to all project stakeholders. Third, many PLAs include provisions to harmonize work time and promote the

efficient utilization of labor, thereby improving project performance. Finally, obtaining the commitment of all of the stakeholders—owners, contractors, union officials, and workers—through a PLA supports an understanding of the requirements of the project and encourages a positive identification with the ends of the project, including getting the job done on time.

## Commitment to the timely provision of skilled workers

PLAs can include provisions that commit local unions to actions and practices that allow contractors to operate efficiently and with the confidence that there will be access to the workers required for the project. The quid pro quo for using local unions as an initial source for skilled workers is that union locals agree to provide the labor needed for a project quickly, usually within 24 to 48 hours. By way of example, the Tappan Zee Bridge, which spans the Hudson River just north of New York City, was upgraded using a PLA that included a commitment that unions provide labor on a timely basis:

> The Contractors agree to hire on the Project craft employees covered by this Agreement through the job referral systems and hiring halls established in the Local Unions' area collective bargaining agreements.…In the event that a Local Union is unable to fill any request for qualified employees within a 48 hour period after such requisition is made by the Contractor (Saturdays, Sundays and holidays excepted), the Contractor may employ applicants from any other available source.

Similar language can be found in almost all PLAs. Such language commits unions to make available skilled workers quickly, and allows contractors to seek alternative sources of labor if the unions cannot provide it, allows better coordination of project workforces, bans job actions, and provides for immediate means of dispute resolution.

## Recruitment of workers from outside the region

The agreement with the local unions does more than provide access to local craft workers. Local unions have arrangements through their international parent organizations to allow for union members from other locals to work on a project when the local labor force is insufficient. With adequate notice, even large projects can recruit a labor force of workers with established employment records from around the nation. The arrangement the locals have with their internationals has proven important for large projects, especially projects in regions with low population density. For example, the construction of the General Motors assembly plant in Lansing, Mich. in the early 2000s was not hampered by the extremely tight labor markets of the time because appropriately skilled labor could be drawn from the Midwest and, if necessary, from other regions of the country. In contrast, trade publications reported numerous delays and price escalation on large construction projects in the years leading up to and during this project.[11]

## Ban on job actions

The complex organization of work and responsibilities on construction sites create considerable potential for misunderstandings and disagreements concerning the "ownership" of work and how the work is to be accomplished. Since construction sites are temporary workplaces, contractors and workers constantly have to determine how to work together to produce a successful project. Unlike a permanent workplace, where issues of who is supposed to do what have been spelled out, in construction these matters often must be resolved anew on each site. The inherent lack of organization on construction sites becomes more complex due to the uncertain lines of authority, particularly on sites overseen by a construction manager. Problems arise frequently because construction plans are often incomplete when projects are bid by contractors. Consequently, many of the details of the work, deliverables, and cost are determined once the project has begun, and decisions have to be made expeditiously so as not to delay work. Therefore, the details of the contract and subsequent decisions are often made onsite, a pressure adding to an already complex situation.

The assignment of work is a frequent source of dispute between contractors and between workers on both union and nonunion sites. In some instances, parties try to claim the work; in others they try to avoid it. On union projects, disagreements over the ownership of work are usually jurisdictional disputes—that is, a disagreement between unions over which union's members should do the work. These disputes may arise when mid-project changes occur or when changing technology blurs craft lines. Despite conventional wisdom, delays about who should do what are not unique to the union sector. Nonunion worksites can also suffer delays when contractors do not agree on the scope of their work.

Work can also be disrupted by labor disputes. On union sites, work can slow or stop due to contract negotiations, disputes over jurisdiction between trades, safety disagreements, or other issues. Nonunion worksites can also be affected by slowdowns, walk-offs, excessive absenteeism, and other labor problems when employees and contractors are in conflict. For institutional reasons, disputes on union sites are more visible, but disputes between contractors and workers on both union and nonunion sites can seriously impede work.

The no-strike/no-lockout language and the dispute resolution processes (discussed more fully in a later section) provided in PLAs have proven to be highly effective in preventing disruptions on union worksites. The dispute resolution provisions of most PLAs (1) provide an expeditious means to resolve any strike or work slowdown, (2) commit union leaders and contractors to take immediate action to resolve the problem and resume work, and (3) impose large and rapidly increasing penalties when strikes or slowdowns occur. The success of PLAs in addressing work disruption issues is demonstrated by the very small number of work stoppages and slowdowns on projects built under PLAs.[12] However, if work disruptions occur, then the disputes are resolved rapidly and prior to serious the consequences that could result. For example, a wildcat work stoppage at the San Francisco Airport in May 1999 under other circumstances might have lasted much longer, but the dispute was resolved in less than 24 hours due to the union leaderships' commitment under a PLA.[13] Although the occurrence of any stoppage might be viewed as a failure, the success in quickly ending the work stoppage was only possible because of the PLA.

### Language to foster efficiency and reduce time to completion

PLAs promote practices that increase project efficiency and may shorten time to completion. One important practice is the harmonization of working hours. For historic reasons, different trades may have different rules about starting times, the number of holidays and the dates when holidays are taken, allowable shift schedules, breaks, and methods of determining overtime. This can result in situations in which carpenters start and end their shifts an hour after electricians, or pipefitters take a day off on Friday when a holiday falls on a weekend while other trades take the day off on Monday.[14] Because of the need for coordination between trades, such differences result in inefficient use of time and/or an excessive use of overtime. By coordinating starting times, holidays, and other work rules, PLAs can improve efficiency, as well as reduce project times and cost.[15]

Another important practice is the creation of labor/management committees to oversee projects and anticipate problems before they occur. For example, many PLAs now include language on pre-job conferences, which permit the parties to discuss issues and resolve them ahead of time rather than wait for them to come up during a project. Determining whether ironworkers or millwrights will do a particular task can be determined at the outset, avoiding any delay that might occur if the decision is left until the start of the task. Similarly, as information about unanticipated problems becomes available, the committees can review the problem and find a solution on the front end to avert delays.

The success of PLAs depends, in part, on craft workers, union officials, and contractors' identification of the project as one in which each participant has a role in making a success. In the course of our interviews, we frequently heard that stakeholders' identification with PLA projects and their investment in the success of the project underlie easier dispute resolution. Jurisdictional issues that might have been fought out at length on other projects were ceded because the

parties wanted the project to move forward without impediment. Labor leaders also indicated that they expected reci-procity on the next PLA; if the Carpenters Union gave up work on this PLA, the Laborers Union would give up work on the next one. Often times, the parties preferred that issues be resolved without the involvement of the project owner. Toward this end, issues were resolved at the lowest level possible.[16]

Most PLAs are negotiated locally. Local negotiation plays an important role in creating understanding and identifi-cation with a project on the part of the local union representatives and membership. There are, however, national agree-ments, such as the Toyota PLA. Although the content of these national agreements is similar across projects, local build-ing trades councils are part of negotiations between the owner and the AFL-CIO's Building and Construction Trades Department. This involvement assures that the members of the local council, who will be signatory to the agreement, understand the agreement and the gains and responsibilities it confers. Local involvement can also play a critical role in adapting the agreement to local laws and conditions. This suggests that, even if the content of PLAs were standardized into sets of alternative language, the discussion, revision, and joint agreement on the language is important to creating the conditions needed for the agreement to be fully successful.

The effectiveness of PLAs in delivering projects on time is due, then, not only to the provisions of the PLA but also to the identification of contractors, union leaders, and workers with the project and its success. The importance of local engagement surfaced numerous times during our interviews with individuals involved in PLAs. When this identification occurs, those involved in the project will seek ways of making the PLA work and often develop informal means of assuring success.

## A case example of a 'close success'

On-time completion of a project may require union leaders' active involvement to assure that labor is available when it is needed and that local disputes do not affect work. In most cases, PLAs commit contractors to using members of the local unions that are signatory to the agreement, but they also commit the unions to provide appropriately skilled labor quickly, most often within 48 hours. In addition, the PLAs specify the actions contractors may take when labor is not available. The standard language allows the contractor to hire from any union local that has members available or, in some cases, any other source at all.

A challenge that the building trades can face is assuring that the timeline of the project is not disrupted by local labor issues. Although PLAs are written so that work is not affected by work stoppages consequent to local bargaining, putting this concept into effect can be difficult. Maintaining the contracted work schedule during periods of tension between employers and the trades can challenge the skills and competing responsibilities of local union leaders and employers.

Much of the large-scale construction work in Minneapolis, Minn. is done under PLAs. The professional construc-tion staff of the municipal airport reports that it builds only under PLAs because the agreements mean it can count on timely completion of the work. This is an important consideration for airlines, which build their flight schedules around the facilities' expected completion date.[17]

In the late 1990s, circumstances converged to test the ability of a PLA to assure on-time completion of a major proj-ect at the Minneapolis Airport. Construction labor markets were extremely tight in the latter 1990s, and large projects in the Minneapolis area required bringing in "travelers," or workers from locals in other parts of the country.[18] The tight labor market also encouraged jockeying between trades in their negotiations over wages and benefits. The electricians had won a favorable agreement from their contractors, and the members of the pipe trades believed they should do as well, if not better, in their negotiations. The negotiations over a new agreement were difficult, and a seven-week strike took place prior to the final settlement of a new agreement.

Work continued on PLA projects as required by the agreement. However, it slowed as travelers—at the first hint of labor troubles—left the area. Since work was continuing on a number of PLA-covered projects, the loss of the travelers left the local unions struggling to staff jobs, including the airport project.[19] The owner and contractors were, in the end, able to

find sufficient labor by shifting labor from less urgent work to the project. The situation was burdensome and was viewed by the airport authority as not in keeping with the commitments made by the PLA. There were concerns on the part of owner representatives that the local union leadership used the slowdown on the PLA work as leverage in bargaining.

Not surprisingly, these problems drove changes in construction labor relations in the city. Because this "close success" left construction stakeholders, such as the airport authority, vocally dissatisfied with the events around the contract negotiations, the local union and employer association agreed that, in future negotiations, they would submit disputes in negotiations to a joint dispute resolution procedure rather than strike. As a result, relations have improved.

A suggestion that emerged from the airport construction situation was the need for greater involvement by local union officials in the negotiation and implementation of PLAs. The airport construction staff says that in some instances the local union officials with whom they worked were not the same officials who crafted the PLAs, and there was a lack of understanding with regard to the role of the local union and its responsibility to keep the project running smoothly. Subsequently, discussions with local union officials were successful in soliciting greater support for the efficient management of the PLA.

### Summary

It is reasonable to conclude that PLAs are most successful, in part, when local union officials and members understand and support the goals of the PLA. Moreover, the union and its members must understand their responsibility as a party to the PLA. The argument is not that national PLAs cannot be successful; rather, it is that local officials need to be involved in the implementation of the national templates. Local engagement is central to gaining the support of the officials who will implement the PLA and to ensuring workers' identification with the project.[20]

## Designing PLAs to improve efficiency and encourage innovation

Due to its complexity, temporary nature, and turbulence, the construction industry faces particularly difficult challenges in productivity improvement and in innovation, including the development of new technologies and the introduction of new work practices. These issues appear regularly in professional journals and books on construction.[21] PLAs can be an effective tool for improving productivity and supporting innovation in organization and work structures. The most immediate improvements are provided in provisions concerning the harmonization of work rules between trades, a move that increases efficiency while reducing costs, and provisions that require jurisdictional issues to be addressed prior to the start of a project. PLAs can also be used to experiment with work rule changes, such as minimum staffing requirements or limitations on the use of particular tools and technology.

### PLA provisions that change work practices

Each construction trade has work practices that have evolved independently over long periods of time. In the unionized sector, practices such as starting time are usually part of the collective bargaining agreement, but they are most likely based on established past practices. Among nonunion contractors, historic work practices are the unwritten "customs of the trade." Problems and subsequent inefficiencies may arise because of differences between trades. For example, electricians may start work at 7 a.m., while carpenters start at 8 a.m. Pipefitters may have ten holidays, electricians nine, and carpenters eleven. In each situation, the lack of coordination between the trades can create inefficiencies.

PLAs often include provisions to harmonize working hours, workdays, holidays, and starting times across trades. Sections from a New York PLA provide basic language for the harmonization of hours:

#### SECTION 1. WORK WEEK AND WORK DAY

Eight (8) hours shall constitute a normal workday's work between the hours of 8:00 am and 4:30 pm (with a half hour unpaid lunch break), five days a week, Monday through Friday. The Construction Manager can elect to work the first shift beginning at 7:00 am through 3:30 pm.

**SECTION 4. HOLIDAYS**

A.  Schedule—There shall be 8 recognized holidays on the Project:

New Years Day

Labor Day

Presidents Day

Veterans Day

Memorial Day

Thanksgiving Day

Fourth of July

Christmas Day

All said holidays shall be observed on the dates designated by New York State Law. In the absence of such designation, they shall be observed on the calendar date except those holidays which occur on Sunday shall be observed on the following Monday.

B.  Payment—Regular holiday pay, if any, and/or premium pay for work performed on such a recognized holiday shall be in accordance with the applicable Schedule A.

C.  Exclusivity—No holidays other than those listed in Section 4-A above shall be neither recognized nor observed.

Collectively bargained work rules may not be well-suited to some projects. In such instances, PLAs can be used to change local rules. For example, a local agreement that does not permit a second shift to be scheduled without a first shift may not fit a school project that requires all work to be done after the school day. Similarly, considerable highway work now takes place at night.

Language to accommodate the multiplicity of needs on construction projects can be found in a number of PLAs. The Mt. Vernon (N.Y.) School District PLA states:

The parties agree that it may be necessary to perform rehabilitation work during periods when school is in session. In that case, the Local Unions agree that the first shift may begin at 4:00 pm and end at 12:30 am (With a ½ hours unpaid lunch period) each day, Monday through Friday.

In some instances, arranging the work week as four 10-hour shifts has advantages over the more traditional eight hours a day, five days a week. PLAs can be used to set aside premium payments required for working more than eight hours a day.  A New Jersey PLA states:

(2) Four Day Work Week: Monday-Thursday; four (4) days per week, ten (10) hours per day plus one-half hour unpaid lunch period each day. The establishment of a four-day workweek will require the prior consent of the Union(s), which represents the affected employees, such consent not to be unreasonably withheld.

Formal and informal work rules exist in all workplaces, construction included. A classic example from construction is bricklayers' informal limitation on the maximum number of bricks laid during a shift. Formal rules may include fixed times for coffee breaks and a minimum number of workers on crews. PLAs can incorporate language that explicitly sets aside particular rules. Because the PLAs are negotiated by union officials and provide gains for workers, provisions for eliminating restrictive practices and work rules are more likely to be effective than unilateral orders to cease such practices. Additional examples of existing PLAs are instructive in the flexibility they offer in the formulation of language that reflects the real conditions of the particular project. An Indiana PLA states:

**Section 1.**  There shall be no limit on production by workers nor restrictions on the full use of tools and equipment. There shall be no restriction, other than may be required by safety regulations, on the number of employees assigned to any crew or to any service.

**Section 7.** The Union will not impose conditions, which limit or restrict production or limit or restrict the joint or individual working efforts of employees. The Construction Contractor may utilize any method or technique of construction, and there shall be no limitation or restriction regardless of source or location of machinery, pre-cast tools, or other labor-saving devices, nor shall there be any limitation upon choice of materials and design.

The Toyota PLA for San Antonio, Texas states:

**Section 1.**  There shall be no limit on production by workers nor restrictions on the full use of tools or equipment. There shall be no restriction, other than may be required by safety regulations, on the number of employees assigned to any crew or to any service.

The Harvard University PLA initially negotiated by the former U.S. Secretary of Labor John Dunlop is particularly thorough in addressing practices and rules than might reduce project efficiency:

**Section 1.**  No rules, customs, or practices, which limit or restrict productivity or efficiency of the individual and/or joint working efforts of employees shall be permitted or observed. The Contractor may utilize any methods or techniques of construction consistent with the Contractor's agreement(s) with the Owner.

**Section 2.**  Except as otherwise expressly stated in this Agreement and in the Project Contractor's agreement with the Owner, there shall be no limitation or restriction upon the Contractor's choice of materials or design, nor, regardless of source or location, upon the full use and installation of equipment, machinery, package units, pre-cast, pre-fabricated, pre-finished, or pre-assembled materials, tools, or other labor-saving devices. The Contractor may without restriction install or otherwise use materials, supplies or equipment regardless of their source. The on-site installation or application of such items shall be performed by the craft having jurisdiction over such work; provided, however, it is recognized that other personnel having special talents or qualifications may participate in the installation, check-off or testing of specialized or unusual equipment or facilities.

**Section 3.**  It is recognized that the use of new technology, equipment, machinery, tools and/or labor-saving devices and methods of performing work will be initiated by the Contractor from time to time during the Projects. The Unions agree that they will not in any way restrict the implementation of such new devices or work methods. If there is any disagreement between the Contractor and the Unions concerning the manner or implementation of such device or method of work, the implementation shall proceed as directed by the Contractor, and the Unions shall have the right to grieve and/or arbitrate the dispute as set forth in Article VII of this Agreement.

## *Using PLAs to improve project coordination*

There have been great advances in organizational structure in much of the economy over the last 30 years. This is particularly evident in manufacturing, where experiments with socio-technical systems and lean manufacturing have resulted in large changes in work and authority structures. While enumerating these approaches is beyond the scope of this paper,

some of the most important changes have involved the flattening of organizational structures and the greater integration of blue-collar workers in controlling production and decision making about production. These changes have yet to move into construction.

Despite the well-understood challenges and failures of current project management practices—challenges that arise from the organizational and task complexity of construction projects, coupled with a top-down decision structure—there has been little or no change in authority and decision-making structure of construction over decades. The lack of change in the face of these challenges reflects not only a comfort with traditional practices, but also a lack of resources needed to support experimentation of the type undertaken by the larger and better-financed manufacturing sector.

An important element in improving construction work practices is increased involvement of those engaged in the project. The central role of daily labor/management meetings that resulted in reduced injuries in the demolition of the World Trade Center in 2001 and 2002 is one example of the importance of engagement in construction projects. In addition, the use of joint labor/management meetings before the start of a project to resolve jurisdictional issues and consider specific problems are often cited by contractors and union officials as important to the smooth completion of a project because they lead to the prompt resolution of problems.

For example, the Illowa Construction Labor and Management Council (of Illinois and Iowa) has adopted an approach in which it is actively engaged throughout each construction project. If there is a labor issue on a project, the first person to be called is the executive director of the committee. The executive director hears the parties and makes a suggestion about how a dispute might be resolved. If the parties are dissatisfied with the suggested resolution, predesignated representatives are called to the site to hear the issue. This team is empowered to make a binding decision and, after hearing the parties, usually fashions a solution without having to impose a decision. The result of this process is that the owner of the project seldom needs to become involved in disputes. As a result of these outcomes, some PLAs include language establishing ongoing labor/management committees or mandating their role in the construction process at specific times. For instance, Section 8 of the Tappan Zee Bridge (N.Y.) PLA requires:

**Section 1. SUBJECTS**

The Project Labor Management Committee will meet on a regular basis to: 1) promote harmonious relations among the Contractors and Unions; 2) enhance safety awareness, cost effectiveness and productivity of construction operations; 3) protect the public interests; 4) discuss matters relating to manning and scheduling with safety and productivity as considerations; and 5) review Affirmative Action and equal opportunity matters pertaining to the Project.

**Section 2. COMPOSITION**

The Committee shall be jointly chaired by designees of the President of the NYS Council and the Construction Project Manager, and shall include representatives of the Local Unions and Contractors involved in the issues being discussed. The Committee may conduct business through mutually agreed sub-committees.

The Harvard PLA requires a pre-job conference to address, among other issues, work assignments:

(a) The Contractor with responsibility for the performance and installation of the work shall make the specific assignment of the work, which is included in its contract, (the "Responsible Contractor"). All work assignments shall be disclosed by the Responsible Contractor (or the Project Contractor, or the responsible Contractor's General Contractor) at a pre-job conference held in accordance with industry practice. Responsible Contractors shall notify the Project Contractor and the affected Unions of the assignment before starting work to be

performed under this Agreement. The Plan for the Settlement of Jurisdictional Disputes in the Construction industry currently in effect, or its successor, shall serve as a guide for establishing jurisdiction at such meetings. Such assignment shall not be changed absent the written agreement of all parties to any dispute arising over such assignment, (including the Responsible Contractor), or pursuant to a decision issued by a permanent arbitrator appointed under this Agreement to hear and decide jurisdictional disputes. Should there be any formal jurisdictional dispute raised, the Project Contractor shall be promptly notified.

## Using PLAs to experiment with change

As previously noted, workplaces and workers are governed by a combination of formal and informal rules. The workplace rules developed over time represent the employers and employees' interests in establishing standards of performance. The employees' desire is to create a work environment that is livable and predictable. As the formal and informal rules of the workplace are important to employees, the rules take on a life of their own.

PLAs are temporary agreements, and so they can be used to experiment with altering work rules and allow the workforce to determine how important or unimportant particular rules are. For example, it has been common practice to have project-wide morning and afternoon breaks timed to the arrival of a food and beverage wagon. Because of the time needed for workers to get to the wagon, wait for service, and get back to their work locations, scheduled breaks can reduce working time and productivity. Therefore, some PLAs explicitly eliminate scheduled breaks. Workers still have break time, and may bring food and beverages for the break to their work location, but working time is increased by eliminating the walk to and from a canteen truck and the wait in line.

In creating opportunities to work under different rules, with the assurance that the traditional rules will be maintained as a general framework, PLAs provide experience with alternative work rules. This can result in both improved productivity on the PLA project and, simultaneously, the experience needed to see if taken-for-granted norms are still valued by the workforce and essential to a labor/management relationship.

## Using PLAs to change work rules

The discussion and examples of the development of PLA language that has been used to address pay adjustments, harmonization of conditions across trades, and work rule changes reveal four basic categories and reasons for the changes:

- requisite adjustment of the rules to fit a project,

- harmonization of the rules across trades to increase efficiency,

- elimination of rules that may reduce efficiency, or

- changes in compensation such as overtime rates or standards for overtime pay.

Many of the rule changes improve efficiency and reduce costs with little effect on pay or work load. Consequently, although the harmonization of rules benefits some trades while disadvantaging others, the net effect is generally neutral.

The question is, then, why would a particular union sign a PLA that may eliminate positions or reduce pay? One possibility is the quid pro quo for long-term employment on a large project. Just as permanently employed construction maintenance workers, such as those employed by universities, accept lower pay, craft workers on large construction projects who are employed for longer periods of time than those on shorter duration construction projects may also accept lower pay. In recognition of this, some unions may sign PLAs that ease some work rules or reduce premium pay. Likewise, easing the rules to provide cost reductions may induce owners to use a PLA. For a sufficiently large PLA, on balance, the large gains in hours of work justify such concessions.

## Summary

Construction projects are complex undertakings that require a high degree of coordination between multiple trades, prime contractors and subcontractors, and managers and owners. Changes in the organization of construction, such as the movement from general contractors to construction managers, increase the challenge to provide successful coordination. PLAs can be used to improve organizational structures and to improve the efficiency of construction projects while lowering injury rates by harmonizing work rules across trades and adapting work rules to the needs of a project. In addition, by mandating activities such as pre-job conferences and regular meetings between the contractors and union representatives, cross-trade coordination can be improved and work issues can be resolved before they affect construction operations.

# Designing PLAs to support communities

Governments and private organizations have struggled for more than a century to allow people from disadvantaged backgrounds to move into decent jobs. The federal Manpower programs of the 1960s, the Comprehensive Employment and Training Act programs of the 1970s and 1980s, and others have achieved only partial success. A critical ingredient missing in many of these programs has been the availability of regular employment for trainees. Both private and public training programs have trained people for occupations that did not have the capacity to absorb all new trainees or did not provide the linkages needed to move trainees into private employment.[22]

During the past 15 years, public PLAs have been used to create structures for moving individuals from disadvantaged populations into the construction labor force. Today, a number of PLAs are referred to as Community Workforce Agreements, since they explicitly attempt to engage local populations in PLA-covered projects. Because the construction projects for which PLAs are written tend to be large multiyear projects, they provide the connection between training and employment absent from many training programs. The success of community workforce investment PLAs on West Coast ports has encouraged the incorporation of provisions for social investment into a number of PLAs with public bodies such as the City of Los Angeles and its school district.

The scope and complexity of the community workforce provisions of PLAs varies with the size and duration of construction projects. Even small projects can support training through provisions requiring minimum ratios of apprentices to journeymen and setting aside limits on these ratios in collective bargaining agreements. Larger and longer projects can incorporate more elaborate structures. They can target areas with large disadvantaged populations, improving these populations' ability to qualify for apprenticeship training through pre-apprenticeship programs, requiring that a minimum number of apprentices and workers on the project be drawn from the targeted areas, and providing community involvement in the training and employment process. PLAs may also encourage minority and other small business utilization by exempting them from the provisions of the PLAs and including provisions to encourage them to participate in projects. PLAs used for school construction have engaged high school students and have increased their opportunities to enter apprenticeship programs.

## Using PLAs for social investment

PLAs vary substantially in the purpose and sophistication of training provided. Even relatively simple PLAs may address training opportunities by setting aside work for apprentices and other trainees. For example, an Indiana PLA stated that apprentices and non-journeymen may make up "up to forty percent (40%) of a craft's workforce…unless the local collective bargaining agreement establishes a higher percentage." The more elaborate training systems, incorporating the full array of elements (discussed below) for bringing the disadvantaged into the workforce, are found on large public projects. The most extensive of these are related to port construction on the West Coast. The ports of Los Angeles/Long Beach, Oakland, and Seattle each provide extensive systems for social investment through PLAs.

A review of the literature on construction training for those from disadvantaged backgrounds suggests that six elements are needed for success: (1) a pre-apprenticeship program, which provides foundation skills and screens enrollees for their ability to handle the demands of construction; (2) a link from the pre-apprenticeship program to apprenticeship opportunities that provides reasonable assurance that those who complete the pre-apprenticeship program successfully will be enrolled in apprenticeships; (3) sufficient apprentice work opportunities so that those who are enrolled in the apprenticeship programs will complete those programs in a reasonable time; (4) continuing work opportunities that allow apprentices to readily move into journeyman status and move forward with their work lives; (5) oversight by representatives of stakeholders in the training and the project and the development of institutions that allow issues to be resolved without disrupting the training (stakeholders include the community from which the target population is drawn, the employers and  locals that are party to the PLA, and the owner); and (6) development of close working relationships from the beginning between community groups and advocates and local building trades unions and councils in the development, crafting, implementation, and ongoing evaluation of these efforts.

These elements are not always easy for the stakeholders in such programs to agree to. Items 2 and 5 can be sensitive for the labor and contractor parties to PLAs, as these create additional oversight for apprenticeship programs. The final item, development of close working relationships between community groups and local building trades, is particularly important to the success of these projects. Conflict between the trades and community groups has occurred when members of communities have viewed the unions as standing between them and good jobs. Similarly, unions and contractors have viewed community groups as naïve about the requirements of construction. Early and ongoing communication between local union leadership, contract associations, and community groups is important to the success of these efforts. Communication is necessary to promote the understanding needed to resolve the differences between the perspectives of the two parties and to fashion workable solutions to the difficulties involved in moving disadvantaged groups into better jobs while protecting established work and skill standards.

### A case study: the Port of Oakland PLA

The incorporation of social investment language into the Port of Oakland PLA during the negotiation of the agreement in 1999 reflects the previously limited success in bringing less-advantaged populations and minority-owned businesses into several large-scale, public construction programs (Sloan et al. 2001).

The Port of Oakland PLA included three goals with respect to disadvantaged populations: (1) the Port's commitment to existing community programs such as its Non-Discrimination and Local Small Business Utilization Program; (2) an effort to engage local firms, which historically had been excluded from large projects in favor of out-of-town contractors; and (3) an effort to involve disadvantaged residents, who had historically been excluded from both union and nonunion jobs on projects. A carve-out program for small businesses and a program to bring local residents from targeted areas into apprenticeship programs addressed these issues.

The carve-out program allowed up to $15 million of the value of the contract covered by the PLA to be excluded from the requirements of the PLA. The contracts covered by this program had to be less than $300,000 in value. Alternatively, a contractor's aggregate contractual value had to remain less than $300,000 to remain exempt from the PLA. In turn, unions agreed to refrain from work stoppages against these contractors. They also agreed that they would not take action against contractors on the Port of Oakland PLA for issues, such as nonpayment to benefit funds, that originated on work not covered by the Port of Oakland PLA.

The targeted construction labor force populations were geographically structured with a hiring requirement keyed to the local impact area (LIA) of the Port of Oakland. The LIA, which includes census tracts with 50% or more of the local population living below the poverty level, included Alameda, Emeryville, Oakland, and San Leandro. The PLA required that residents of the LIA perform 50% of labor hours on a craft-by-craft basis. In the event that there were not



**SOURCE:** Johnston-Dodds (2001).

a sufficient number of workers living in the LIA to meet this requirement, the labor hours could be made up by residents of Alameda and Contra Costa counties.

The administration of the social investment terms was overseen by three committees: the Social Justice Committee (comprising community representatives appointed by the port), the Joint Administrative Committee (five union and five contractor representatives), and the Social Justice Subcommittee (four community representatives, three union members, three contractors, one Building Trades representative, and one port representative). A diagram reflecting the committee composition is shown in **Figure A**.

The roles of the Social Justice Committee included: (1) a review of monthly reports on social justice programs; (2) program and funding recommendations to further social justice goals of the PLA; (3) oversight of contractor compliance;

(4) referral of complaints about social justice violations to the social justice subcommittee of the joint administrative committee of the PLA; and (5) collaboration with the workforce development agencies to provide services to support workforce development efforts such as pre-apprenticeship programs. The social justice activities were supported by a $0.15 per craft hour contribution up to $1 million.

As the diagram shows, the structure of the social justice program links the Social Justice Committee and the Joint Administrative Committee, which oversees the funds produced by the hourly contribution, through the Social Justice Subcommittee. This creates a means for the stakeholders[23] in the social justice program to discuss issues and develop solutions without involving the community stakeholders or port in the administration of the apprenticeship program or contributed funds.

A critical issue in moving the social justice goals of the PLA has been to prepare prospective residents of the LIA for apprenticeships. Although almost 500 residents of the LIA had entered apprenticeship programs by mid-2001, the numbers of local hires and apprentices were considerably below the local hiring and apprenticeship goals. To address these needs effectively, the Bay Area Construction Sector Intervention Collaborative (BACSIC), a collaboration of community groups and the building trades, formed to provide basic construction skills and establish a central training site in Oakland. BACSIC provided fundamental educational and remedial resources, including "soft skills" development training in areas such as dependability, attendance, communication, and problem-solving; on-site pre-apprenticeship and trade-certified apprenticeship training; employer-based job training; on- and off-site supportive services (life skills training, housing, child care, transportation assistance, primary health care, mental health and substance abuse services, and domestic violence services); and job linkage services.

While issues remained for this particular PLA, it was more successful in meeting the social investment needs of the community than prior large public works projects and provided a foundation for the social investment provisions of other West Coast PLAs.

### *A case study: The Los Angeles Community Redevelopment Agency PLAs*

In March 2008, the Los Angeles Community Redevelopment Agency adopted a policy that requires construction projects receiving a threshold level of subsidy to be completed under PLAs with provisions for the hiring of local and disadvantaged workers. The Los Angeles Community College District (LACCD), the Los Angeles Unified School District (LAUSD), and the City of Los Angeles each signed a PLA incorporating provisions required by the redevelopment agency.

Both the community college district and the school district had prior experience with PLAs and had incorporated pre-apprenticeship programs into them. Although provisions vary between these PLAs, each incorporates requirements or goals for the hiring of local residents from low-income areas as apprentices and for the employment of "at risk" former offenders and youths. The community college PLA covers $1.1 billion in construction; the city contracts $382 million. While the projects being built under these PLAs are ongoing, early results indicate a favorable effect on hiring targeted populations. A report from the UCLA Labor Center (2009) on the community workforce provisions of PLAs negotiated under the guidelines of the redevelopment agency reached nine conclusions:

1. Local hiring provisions in PLAs significantly increased the number of local hires. We base this on a comparison between one Los Angeles City project for which local hiring PLA provisions were not thoroughly applied and four similar projects for which these provisions were applied and followed.

2. Local hiring goals of 30 percent were met and exceeded on all three PLAs. In fact, local hires—including apprentices and, under some agreements, disadvantaged workers—typically were about 35 percent of all hires.

3. Compliance should be measured on a project-by-project basis. In our case studies, local hiring goals were applied to the specific building project as a whole, allowing some subcontractors to exceed local hiring goals and some subcontractors to fall short.

4. Large subcontractors and general contractors disproportionately assumed responsibility for meeting local apprentice and journey worker hiring goals. In analyzing Los Angeles City projects, we found that small subcontractors tended to have a lower percentage of local apprentices and local journey workers than did larger subcontractors and general contractors.

5. Apprentices on new construction came on the job later than journey workers. Construction projects have a ramp-up period followed by full construction and then a finishing-off period. Early in a project's lifecycle, contractors met local journey worker hiring goals, but not those for apprentices or local apprentices. Later, as the project hit its stride, apprentice and local apprentice goals under the PLAs tended to be met.

6. Contractors improved their local hiring attainments as they gained additional experience. Our analysis of LAUSD data concluded this to be true for LAUSD projects.

7. On LAUSD contracts, contractors on moderately paced contracts met local hiring goals more easily than did contractors on fast-tracked LAUSD projects.

8. Forty-one percent of apprentices, 39 percent of journey workers, and 23 percent of foremen on LAUSD projects were local hires. This suggests that contractors emphasized hiring local apprentices, a significant finding because one of the goals of local hiring is to encourage the entrance of local workers into the construction trades through apprenticeships.

9. The success of local hiring goals depends on the size of the local area from which hires will be sought. In the case of the LACCD, two local areas were defined: a small area that included only the zip code in which the project was being constructed, and a larger area that consisted of the overall LACC district. The nine LACCD projects we studied all met or exceeded the 30 percent local hiring goal established by the PLA. Typically, only about 5 points of these 30 percentage points came from the narrow definition of "local"—that is, the zip code area in which the project was being constructed. The remaining 25 percentage points typically came from the larger local area.

Both the Port of Oakland and the Los Angeles PLAs required extensive initial negotiation, complex institutional structures, and ongoing discussions between the stakeholders to keep the programs on track. It is doubtful that such an agreement or program would be possible absent unions and signatory contractors and the use of PLAs. The nonunion contractors lack the institutional structure needed to negotiate and oversee agreements that accomplish the ends of the Port of Oakland and Los Angeles PLAs. Nonunion training programs are generally not sufficiently developed to meet the training requirements of these programs. There is no obvious means for nonunion contractors to obtain the assent of the existing workforce to the substantial changes required by these agreements. Finally, while unions and signatory employers have hiring rules that provide a relatively structured and transparent system by which trainees can obtain employment once their apprenticeship is completed, there is considerably less assurance that trainees will be provided fair access to employment once a project is completed.

## Using school PLAs to develop the construction labor force

It has not always been easy for the construction industry to recruit good high school students into apprenticeship programs. The best high school students are pointed toward college, and construction suffers from the perception—which is not completely untrue—that it is a difficult, dirty, dangerous, and cyclical industry. Nonetheless, construction needs

young people who have the work ethic and general skills to succeed in the industry. As Michael Crawford, in his recent best-seller *Shop Class as Soul Craft*, points out, skilled manual work requires a sophisticated understanding of physical systems and an ability to integrate this knowledge into action that produces the desired result in an efficient manner. Exposure to construction work has the potential to attract excellent students who would otherwise follow the college track. Exposure to this type of work might also persuade more high school counselors and teachers that skilled construction training provides a satisfactory alternative to college for students who are so inclined, even if they have the ability to succeed in college.

## The San Jose Construction Academy

School PLAs have been used to provide high school students with construction experience and establish ongoing construction training programs for both blue-collar trades and white-collar professions. An example can be found in San Jose, Calif. In March 2002, voters in San Jose's East Side Union High School District approved a $300 million bond issue to be used for school construction and renovation. Virtually every high school in the district was to undergo comprehensive renovations, and several new facilities—such as adult learning centers, a gymnasium, and even a cable television and radio studio—were to be built at some of the schools. Although some work had already taken place, in 2004 the district entered into a PLA with the Santa Clara and San Benito Counties Building and Construction Trades Council.

The district decided on a PLA, in large part, because it saw the agreement as a mechanism to expand its vocational education programs into both the blue- and white-collar construction occupations. The district has a well-established vocational education program that is part of its career services approach to education. The East Side already had several vocational academies operating, and the district viewed the PLA as a means to establish a program in construction occupations. The novelty of the East Side PLA, and the sweetener that led to its signing, was a provision connecting work under the PLA with the establishment of a Construction Technology Academy that would offer pre-apprenticeship training, summer internships, and work in both the trades and white-collar construction occupations.

Thus, the East Side PLA is innovative in several ways. First, it is an example of a new form of PLA that attempts to find new areas of win-win in construction collective bargaining by bringing a new player to the table, the owner—in this case local school administrators and elected members of the school board. Second, it is an effort to recruit high school students into the construction industry through an institutionalized mechanism in order to better compete with other industries for talented labor. This aspect of the agreement directly addresses training problems posed by the retirement of the baby boom generation. Third, it is an effort to solve a school district's problem of creating meaningful education for those not bound for college, an education that provides the student with an awareness of possibilities, prepares the student appropriately for the demands of the labor market, gives the student experiences that will qualify him or her for advancement, and allows the student in this case to "test drive" a full range of blue- and white-collar opportunities within an entire industry. Finally, by requiring participating contractors to provide employment, through the auspices of the PLA, this particular institutionalization of a journey from school to work seeks to overcome the weakness of previous similar experiments by putting students to work rather than on job lists. Certainly, like other PLAs, this agreement was motivated by traditional concerns for work and the conditions of work on the part of unions and by the need to develop an adequate supply of skilled and qualified labor on the part of construction owners. However, these traditional motivations were not paramount. The novel and experimental motivations listed above were the fundamental reasons this PLA was signed. An appendix to the PLA contains the essential elements of the plan:

> The Parties have agreed to create a Construction Technology Academy ("Academy"), funded by the District, to carry out the training and employment objectives of Appendix B. The overall objectives are to (a) offer opportunities and skills necessary to enter post-secondary study [including construction apprenticeship programs as well

as college education] and to pursue lifelong learning within the broader context of the building trades industry and (b) develop and reinforce academic course content standards in order to maximize career opportunities and technical competency.

Sub-provision (b) recognizes that schools would do a better job if the school curriculum were tied more closely to industry needs and directions. In construction, unions as well as contractors pay close attention to technological trends and customer demands. Thus, connecting the school's curriculum to the knowledge held by contractors, unions, and joint apprenticeship boards was seen as an effective method of tying industry directions to the school curriculum in the case of construction. A 16-member steering committee was created by the PLA to oversee the academy. Membership on the committee includes representatives of the joint apprentice training councils, the building trades council, and the school district. In addition to the creation of a steering committee, which binds the school district, the PLA requires the unions and the joint apprenticeship training councils and contractors to give preferential consideration for admission to apprenticeship programs to graduates of the academy. The goals of the PLA are for students to obtain actual work as interns and then as apprentices. This is accomplished by placing 30 interns per year in a five-week rotation among the trades. First, students are taught about estimation, engineering, and legal aspects of construction. Then students are given internships, which take place when school is out and construction activity is at its peak. The internship program also qualifies as a pre-apprenticeship program, gives students priority for entering union apprenticeship programs, and provides a point of entry for a number of minority students into union employment. Even if a student does not become an apprentice, he or she has the opportunity to enter the workforce as a material handler or in another unskilled position.

More than five years of experience with the construction academy suggest that this model for providing training and work experience to high school students works. The academy has been successful in giving students a broad experience across a number of trades and placing some graduates in apprenticeships, while others have chosen to attend college. Despite the current state of the construction economy in California, the academy continues to offer outstanding training in construction and has provided a model for high schools throughout California. Experience with the academy also provided the experience and energy for the Building Trades to establish a summer program for K-8 science and math teachers to be exposed to the construction industry and develop curricula that incorporate material from the industry into their teaching. To some degree this involvement promotes the industry, but it also provides an immediacy and relevance in the curriculum that enhances students' interest.[24]

Using PLAs to create journeys from school to work in construction is a work in progress. However, the unions are helping with the creation of a solid pre-apprenticeship program that will enhance the students' ability to qualify for apprenticeships after graduation. A key and unique provision of the San Jose PLA was its requirement for internships, combined with language that ensured graduating students would get jobs either as apprentices or as material handlers. A major hurdle facing the union construction industry has been, in the view of one union leader, the lack of a means to move younger workers into the union workforce in the face of apprenticeship admissions standards and regulations that require nondiscrimination and fair access to these programs. The solution was the proviso in the PLA that requires participating contractors to provide graduating students with jobs, either as construction apprentices or as material handlers. This requirement means that students at least transition to non-craft material-handling jobs or qualify as experienced applicants to apprenticeship programs.

Experiments of this type are not limited to San Jose. A recent PLA in Buffalo, N.Y., also focused on school construction, provides another example of a pre-apprenticeship program provided to vocational high school students. The PLA maintains that the students "shall perform 'hands-on' work in the trades."[25]

## Summary: gains and challenges for labor from social investment PLAs

As social investments, PLAs provide clear gains to construction stakeholders and the community. First, PLAs provide a greater opportunity than many prior public training programs for different populations to attain middle-class jobs. PLA-based programs provide not only the training and work experience required for a successful career in construction but also, for the successful trainee, a place in a system that offers ongoing access to employment. Second, PLAs create connections and opportunities for dialogue and understanding between the building trades and community groups that have not been present in the past.

An important issue in thinking about using PLAs to support community development is how large the PLA has to be for these efforts to be successful. The West Coast port projects are large, multiyear projects that involve hundreds if not thousands of workers. While such projects allow for the advancement of local residents through pre-apprenticeship programs into apprenticeship programs, and finally into journeyman status, smaller projects that involve less investment and fewer workers and shorter completion times may have more limited opportunities for social investment. Despite these issues, inclusion of community workforce provisions is common in public PLAs, particularly on the West Coast. According to one study, nearly three-quarters of the public PLAs in California contained goals or requirements focusing on underutilized or minority employees (Johnston-Dodds 2001, 36).

Experience in Canada with social investment PLA-like arrangements illustrate the potential for conflict between communities with regard to access to training and employment opportunities. The Canadian labor movement  has shown foresight in creating pathways to careers in construction for First Nation members, but fractures between First Nation communities have led to disagreements about whether to recognize members of one community as qualified to participate in projects taking place within the territory of another.[26] Although parallel problems have not appeared in PLAs involving social investment in the United States, they need to be anticipated.

While other publicly supported construction training programs have in the past been used as vehicles for community development, PLAs are economically better for trainees, communities, and construction unions. Previous large-scale training programs have often failed to connect trainees with jobs and have spilled large numbers of partially trained workers into the labor force, often without regard to the demand for their skills. This excess supply of semi-skilled workers undercuts wages and benefits for similarly trained workers throughout the region. Further, because the employers of trainees have often tended to follow a low-skill/low-wage business model, trainees seldom receive the additional training required to move into better-compensated positions with good wages and benefits. By giving the building trades and signatory contractors a large role in the training structure, PLAs support the growth of a higher-skilled and higher-wage labor force that benefits the trainees and their communities. Although there are many difficult issues in social investment through PLAs, it is an opportunity to be grasped.

Finally, even though community workforce agreements can present difficult issues, building trades unions and employer associations have decades of experience in negotiating agreements. This experience can be put to use in assuring that all stakeholders move forward in good faith. It is not obvious how, absent collective bargaining, the complex mechanisms for community involvement and social investment can be established and maintained.

# Designing PLAs to improve safety and health

The dynamic and complex nature of construction sites makes them among the more dangerous workplaces in the country. Approximately 1,200 construction workers lose their lives annually on construction sites, a rate equal to 12.3 fatalities per 100,000 full-time equivalent workers. In contrast, the fatality rate in manufacturing is between 2.3 and 3.3 per 100,000. Over a 35-year career, 0.4% of the construction workforce is expected to suffer a fatal accident. In addition, 6% of construction workers suffer a non-fatal injury each year.[27] While fatalities have declined dramatically in most industries, they have remained stubbornly high in construction over the past two decades, holding between 1,000

and 1,300 each year between 1995 and 2008; the number of fatalities varies with cycles in construction activity.[28] The stability of the fatality numbers indicates that little headway is being made, despite ongoing concern by the stakeholders in the industry.

While the nature of construction creates safety issues, the fundamental disorganization of construction sites makes improving safety particularly challenging. There may be dozens or hundreds of contractors on a site, and each with its own safety program. These programs vary greatly in effectiveness; some are well structured to improve safety while others are created to satisfy legal or insurance company requirements. As each firm's safety program potentially affects not just that firm's workers but other workers on site as well, the potential for confusion, trouble, and serious accidents is substantial on almost every construction site.

Research on safety and health on construction sites suggests that five elements are necessary for a safety plan to reduce injuries and fatalities: [29]

1.  health and safety committees for the project as a whole (planning/oversight) and an active health and safety committee structure at the worksite that reflects the changing set of trades onsite over the course of the project;

2.  an explicit training program for both apprentice and journeymen related to the site;

3.  specific procedures to ensure a health and safety culture, e.g., regular morning meetings on training;

4.  consistent tracking of workplace injuries and illnesses on the site and evaluation of "near-miss" situations; and

5.  linking of health and safety to workers' compensation to provide cost savings for effective health and safety programs.

### *The World Trade Center demolition as a model for a safe construction worksite*

A case study of the importance of labor involvement at all levels of safety programs can be found in the success of such programs in preventing fatalities and limiting injuries during the World Trade Center demolition. Demolition sites are particularly hazardous because of the instability of the structures and unpredictability of the kinds of materials being removed. The challenges of the World Trade Center were especially difficult because of the condition of the site and the amount of hazardous particulate matter, the number of workers onsite, the treatment of the site as a rescue operation rather than a demolition site, the stresses on the site because of the condition of the foundation, and the number of organizations involved in the operation.

Despite severe conditions, there were no fatalities on the World Trade Center demolition site, and not one of the 57 lost-time injuries was life threatening.[30] This record is particularly notable as more than 10,000 construction-related personnel were on the site between September 11 and the completion of the demolition. The success was achieved in large part because the parties to the demolition—federal, state, and local agencies; construction managers and contractors; union leaders and the craft workforce—took a cooperative approach to safety issues.[31] The parties agreed to five principles for administration of the site safety program: (1) mutual respect for all involved parties; (2) the right of workers and their unions to organize a structure that would give voice to their concerns and advance their interests; (3) a genuine commitment to health and safety that is reflected in the allocation of agency and contractor resources and staff; (4) a mechanism and commitment to communicate across government agencies and to coordinate all activities between agencies to ensure smooth operation throughout the site; and (5) immediate abatement of identified safety and health hazards (Grabelsky n.d.).

To implement the program, the Occupational Safety and Health Administration (OSHA) undertook a policy of "protection, not citation" and provided ongoing technical support to determine how best to protect workers from the multiple dangers on the site. In addition, contractors, unions and the CPWR–The Center for Construction Safety and

Research provided training for more than 2,000 workers who spent time on the site. Finally, a structure that involved all of the parties engaged in the demolition was established to monitor and address safety issues: Grabelsky writes:

> A two-tiered health and safety committee (LMHSC) involving both labor and management representatives were established to quickly identify and correct safety hazards. A Leadership Oversight Committee comprised of the chief elected union officials, key staff from the site contactors, as well as representatives of employer associations, OSHA, and the Department of Design and Construction of New York City. A site committee—comprised of union stewards and operations and safety staff, contractors and agencies—met once a week. The meeting was followed by a walk-through of the site by committee representatives to identify hazards and ensure they were immediately corrected. The committee produced a weekly Safety Bulletin that was widely distributed through a network of union stewards who met every week to identify safety hazards, propose safety interventions, and review health and safety issues for daily tool box talks with their members. OSHA sampling result summaries were also distributed and discussed weekly at these meetings, and again monthly with the Leadership Committee.  (Grabelsky n.d., 6)

This joint structure required extensive communication between agencies, organizations, and individuals who do not typically work with one another on a project. The marked success of this effort is reflected in a lack of fatalities and the low incidence of lost-time injuries—an incidence that was well below construction industry standards. It points strongly to the importance of sharing of responsibility and authority on safety matters, and integrating the full workforce into the safety effort. Although the WTC demolition was not conducted under a PLA, the success of this project points toward the type of provisions needed in a PLA to improve safety performance.

### The current state of safety and health provisions of PLAs

The majority of PLAs codify but do not alter existing safety programs. PLAs generally specify that the construction manager must establish a set of worksite safety rules in consultation with either a general labor/management committee or a safety-specific labor/management committee. Provisions related to drug and alcohol testing may be specifically included in a PLA. The PLA may also include a provision to adopt safety practices necessary as part of an Owner Controlled Insurance Program (OCIP), sometimes referred to as wrap-up insurance. In addition, provisions for emergency work across trade lines in the event of accident, fire, or "act of God" often appear in PLAs, although not necessarily in the health and safety section of the agreement. In short, health and safety language in PLAs can range from perfunctory to very detailed. Often, if a PLA has perfunctory language it is because there is a highly detailed health and safety program, which may include drug testing, in a separate document.

An example of safety language from the Rockland County, N.Y. Courthouse PLA states:

**ARTICLE XIV – SAFETY PROTECTION OF PERSON AND PROPERTY**

**SECTION 1. SAFETY REQUIREMENTS**

Each Contractor will ensure that applicable OSHA requirements are at all times maintained on the Project and the employees and Unions agree to cooperate fully in these efforts. Employees must perform their work at all times in a safe manner and protect themselves and the property of the Contractor and Authority from injury or harm. Failure to do so will be grounds for discipline, including discharge.

**SECTION 2. CONTRACTOR RULES**

Employees covered by this Agreement shall at all times be bound by the safety, security and visitor rules as established by the Contractors and the Construction Manager for this Project. Such rules will be published and posted in conspicuous places throughout the Project.

Even this simple language improves on the baseline protections provided in the Occupational Safety and Health Act by making OSHA requirements enforceable under the dispute resolution procedures of the PLA and by establishing some common practices across contractors.

## A case study: the safety success of the Boston Harbor Project

The Boston Harbor cleanup project, conducted between 1986 and 2001, involved 23 million hours of craft labor over the course of 15 years and expenditures of $3.6 billion. The lost-time incident rate was 4.1%, compared to a national average for heavy construction of 6.2% (Dunlop 2002; Armstrong and Wallace 2001). Further, the lost-workday incident rate was 134.7% for Boston Harbor versus a national heavy construction rate of 150.4%.[32] Later analysis indicated that the lost time incident rate was 40% below the heavy construction average for the 36 million exposure hours on the project (Armstrong and Wallace 2001, 15). Paralleling the World Trade Center, the success of the Boston Harbor Project in reducing injuries reflects both a serious dedication to worker safety and the embodiment of this dedication in contractual structures to provide a safe workplace. Different, however, from the World Trade Center project was the geographical scope and duration of the Boston Harbor Project, which make the project's success even more impressive.[33]

In contrast to many construction operations, the stakeholders in the Boston Harbor Project agreed that safety took priority over production and that potentially unsafe operations would be shut down until safety matters were resolved. The labor/management committees created under the PLA provided the means to create an ongoing awareness of safety among the workforce. They intentionally made information about safety matters available to stakeholder representatives; they conducted regular tripartite meetings to discuss safety issues and acted on the joint decisions; and they delivered safety decisions and information to the workforce. Craft workers met each week to discuss safety information disseminated by the project labor/management committee, and the conditions and practices that might affect the safety of their work. Information from these meetings was forwarded by stewards to the project labor/management committee for discussion and action. Regular labor/management meetings reviewed all safety incidents and information on safety matters forwarded from the craft worker meetings. The discussions were recorded and the decisions of this committee were quickly implemented. While Boston Harbor's strong record with respect to safety can be attributed to dedication of the stakeholders, structures created by the PLA were critical in turning this dedication into effective action. Similarly, programs have been adopted by other large projects built under PLAs in the Boston area, including the Central Artery Tunnel project (the "Big Dig") and the Logan Airport expansion. Not surprisingly, both had excellent records with respect to safety and health.

## Safety provisions of other PLAs

Another example of a PLA that creates structures to improve project safety is found in a Washington PLA, part of which is reproduced here:

16.1 The parties to the agreement will participate in the Voluntary Protection Program….In the VPP, management, labor, and government establish a cooperative relationship at the workplace to address worker safety and health issues and expand worker protection.…

16.2 The parties to this agreement will form a joint Labor/Management Safety Committee consisting of equal numbers of contractor and Union representatives, to be agreed upon by the parties, which shall be jointly chaired by the site representative of [the construction manager] and an official of the Building and Construction Trades Council.…

16.3 The [construction management] team will develop a Project Safety Committee of contractors' employee representatives to address issues pertinent to activities onsite, plan and discuss future project work and review the current health and safety plan and procedures.…

16.4 Formal safety and health training is required of all contractors for their employees.…

16.5 It shall be the responsibility of each Contractor to ensure safe working conditions and employee compliance with any safety rules contained herein or established by the Owner, [construction manager], or the Contractor.

16.6 Employees shall be bound by the safety, security, and visitor rules and environmental compliance requirements established by the Contractor, [the construction manager], or the Owner.…

16.7 The use, sale, transfer, purchase and/or possession of a controlled substance, and/or alcohol while on the Owner's premises at any time during the workday are prohibited. Contractors will implement a drug policy meeting [the construction management firm's] minimum standards for Drug-Free Workplace Program separately attached under Appendix D. [The construction manager] may conduct reasonable searches, as permitted under the law, including random searches, of all workers on site and may require and receive the results of a 7-panel drug screen test of any worker on site. Any worker found to possess or be under the influence of an article prohibited by the Standards, or refusing to be tested or consent to a reasonable search may, in [the construction manager's] sole discretion, be immediately removed from the project site and denied future access.…

16.8 These procedures outline the safeguards set forth for the testing of employees for prohibited and controlled substance, adulterants, and alcohol. It is agreed, with respect to such test procedures, that: (i) no person referred from the Union hiring hall shall be allowed on-site as an employee until such person has completed and passed any test(s) required under the program; (ii) a person who is put to work immediately after having passed the tests shall be paid starting at the time he reported for the test(s); and (iii) where a contractor requests a person to report for purposes of pre-employment substance abuse and alcohol test, and does not intend to place him in an active work position on that day, the person shall receive four (4) hours or pay at the regular straight-time hourly rate if the test is negative.

16.9 The authorized [sic] use or possession of firearms, weapons, explosives, or incendiary material on or near the Project premises…is prohibited.…

16.10 The parties acknowledge that the environmental and safety restrictions governing conduct at the Project site prohibit smoking at any time in any facility.…

16.15 Violators of the [program] will be subject to termination for cause with the same conditions for rehire as established in Article IX [referral provisions].

As the Boston Harbor PLA and World Trade Center agreements demonstrate, the agreements have the potential to improve project safety. Concretely, the agreements can mandate safety programs and standards and establish structures in keeping with the five steps needed to improve safety. Realizing this potential requires that the parties to PLAs value safety and be willing to create the structures needed to provide it.

### *Potential cost savings through safety provisions in PLAs*

The safety improvements established by PLAs can also serve to reduce project costs and improve the performance of the workers' compensation system. In mandating a single shared safety program, PLAs overcome the problem of coordinating the multiple safety programs that exist on most sites. Thereby, the consolidation of safety programs reduces costs. For example the Eastside Reservoir construction project in California, a $2 billion project begun in 1994 that required two dams and created a four-and-a-half-mile lake, utilized a PLA that allowed the parties to consolidate over 250 safety programs conducted by over 250 subcontractors and 20 general contractors. According to a representative of the project owner, the Metropolitan Water District of Southern California, this resulted in a savings of $30 million in insurance costs (Plemon 2004).

PLAs may also be used to improve worker performance and sometimes reduce costs. A number of states now allow for workers' compensation "carve-outs," the creation of a project- or industry-specific workers' compensation system that allows the use of alternative dispute resolution (ADR) systems, in place of litigation, for the resolution of conflicts. The use of ADR holds out the possibility of swifter and less-costly dispute resolution over workers' compensation cases. Early research by the California Division of Workers' Compensation (1996 & 1997) suggested that carve-outs reduced litigation, returned workers to work more rapidly, and reduced the cost of workers' compensation. A more recent and nuanced study, *Carve-outs in Workers' Compensation: An Analysis of the Experience in the California Construction Industry* (Levine et al. 2002) found that use of such systems improved injured workers' situations with regard to resolution of disputes but did not have a systematic effect on costs. The carve-outs remain an option that can be created through PLAs when the parties believe they would serve to improve performance of the workers' compensation system.

### *Summary*

Safety remains a serious problem on many construction sites, where fatalities remain a reliable metric of the lack of adequate precautions. A number of steps can be taken to improve construction safety, but for reasons having to do with industry structure, culture, and knowledge, these steps are not implemented on most sites. PLAs offer a means of improving health and safety by establishing the structures that have been demonstrated to improve safety performance on construction sites.

## Designing PLAs to resolve disputes

Labor disputes in construction are much less common today than they were 30 years ago, when the sector accounted for 5% of employment but a quarter of all strikes (Mills 1980). Nonetheless, the potential for work disruptions remains, and it deserves the attention of unions, contractors, and owners.

The importance of the issue was highlighted by the July 2005 Construction Users Roundtable's *Tripartite Initiative Report: Eliminating Work Disruptions and Jurisdictional Disputes*. Many of the recommendations in the report could be handled by a PLA and, in fact, a number of them are typically found in PLAs, including:

- Mandatory "pre-bid" conferences to "identify possible challenges of a particular project (jurisdictional assignments, jobsite issues, working conditions, sequence of work, schedules, etc.)."

- A requirement that employees sign a statement "acknowledging that work disruptions on the project are prohibited and that violators will not be eligible to re-employment…(an expedited grievance procedure should be available…)."

- Mandatory "pre-job" conferences for all contractors and subcontractors; "[a]dopt uniform pre-job procedures for all contractors and subcontractors on a project that require them to identify manpower requirements and proposed jurisdictional assignments."

- Frequent labor-management meetings at the project level.

The purpose of this section is to discuss a number of practices that are included in PLAs and are being used by labor and management to resolve disputes and assure the timely completion of projects.

## Using PLAs to avoid disruptions

*The Building and Construction Trades Department Model PLA.* Most PLAs include several sections on dispute resolution to deal with issues ranging from job actions to grievances to jurisdictional disputes. The Building and Construction Trades Department (BCTD) of the AFL-CIO provides guidance on these matters through a model PLA, first developed in 1997 and revised twice in response to local conditions and experiences in contract administration. The 1997 model PLA included three separate dispute settlement procedures: (1) a "traditional" three step grievance/arbitration procedure; (2) a procedure for the settlement of jurisdictional disputes, and (3) an expedited arbitration procedure, included within an article on "Work Stoppages and Lockouts."

The first two dispute settlement procedures remain in the most recent model PLA. The expedited arbitration procedure concerning work stoppages and lockouts has been eliminated from the model PLA, but is still included in some actual PLAs. Further, in guidelines accompanying the 2008 BCTD model PLA, it is recommended that parties at the local level negotiate an expedited arbitration procedure for dealing with work stoppages and lockouts.

Article V of the revised model agreement offers strong language on strikes and lockouts:

- Section 1 contains a broad proscription on job actions: "…there shall be no strikes, picketing, work stoppages, slowdowns or disruptive activity for any reason by the Union…and there shall be no lockout by the Contractor."

- Section 2 allows for disciplinary action against employees who engage in a proscribed activity and stipulates that such individuals shall be ineligible for rehire for at least 90 days.

- Section 3 requires a general president to "use the best efforts of his office" to cause a local union to "cease violations of this Article."

As mentioned, the model agreement also contains a typical multistep grievance and arbitration procedure that may be used for "any questions or disputes arising out of and during the term of this Project Agreement." Jurisdictional disputes are specifically excluded from the grievance procedure, but are addressed in a separate article of the model agreement.

Step 1 of the grievance procedure allows for any employee, through his or her local union business representative or job steward, to present a grievance to the contractor's "worksite representative" within five working days of the occurrence of an alleged contract violation. The parties shall attempt to resolve the matter within three working days. Following any meeting with the union representatives, the contractor must issue a decision within 24 hours, and the union, if dissatisfied with the response, has 48 hours to proceed to Step 2.

The model agreement also allows unions and contractors access to the grievance procedure. In such cases, if the parties cannot settle their differences in three working days they may proceed to Step 2.

At Step 2, the contractor and an international union representative must meet within seven working days to attempt settlement. If settlement is not reached, the parties have seven days to request arbitration.

The model agreement suggests that the parties mutually select an arbitrator, but if unsuccessful they can turn to the American Arbitration Association for a list. Further language requires the strict interpretation of time limits and instructs the arbitrator to consider only the issues before him or her, and to avoid changing, amending, adding to, or detracting from the PLA.

Finally, the model PLA provides for the settlement of jurisdictional disputes with reference to the *Plan for the Settlement of Jurisdiction Disputes in the Construction Industry*. That is, all jurisdictional disputes should be settled in accordance with the requirements and procedures of the plan. The model PLA proscribes jurisdictional work stoppages. Pre-job conferences are also required as a means of forestalling jurisdictional disputes.

### Language in actual PLAs

Some of the differences in dispute settlement procedures between actual PLAs and the BCTD model are minor and more procedural than substantive. For example, there are slight differences in the number of arbitrators named to handle expedited complaints; liquidated damages may be higher than $10,000; time limits in the grievance procedure sometimes vary; and the Federal Mediation and Conciliation Service or state agencies are sometimes named as sources for arbitrators rather than the AAA. The discussion below focuses on more substantive matters.

### Procedures to deal with job actions

Beginning with the no-strike/no-lockout clauses, all of the agreements we reviewed contain some type of guarantee that the project will be free of work stoppages and lockouts. In most cases, such guarantees are broad and cover all types of possible disputes. In about one-third of the PLAs reviewed, however, there is an explicit exemption for work stoppages caused by an employer's delinquency in payments to joint trust funds. That is, even under the PLA, the unions reserve the right to strike if an employer falls behind or fails to make payments to health care or pension funds. It is also typical that when such a right is reserved, additional language requires the union to give an employer notice (five days, for example) before beginning a strike. As well, several of the agreements—including this example from Minnesota—state that the unions may withhold labor for nonpayment to funds "provided such withholding of services shall not be accompanied by picketing, hand billing, or advising the public of the existence of a labor dispute against a delinquent employer."

About half of the PLAs reviewed contain no expedited procedure for determining whether a proscribed job action occurred, nor any provision for the payment of liquidated damages. As mentioned above, expedited arbitration procedure concerning work stoppages and lockouts has been removed from the BCTD model agreement, perhaps due to its lack of popularity at the local level. In some of the PLAs lacking an expedited procedure a statement such as "…any aggrieved party may immediately commence an action for injunctive relief… " is included.

A number of PLAs have language for the continuation of local terms and conditions in the event of an impasse in bargaining; they often also have language for the retroactive application of any new conditions after settlement.

An issue with strike bans in PLAs is whether work stoppages over safety are covered by these bans. Stopping work to get serious safety issues addressed is common in construction and can be an effective means of resolving threatening problems promptly. Absent specific language in PLAs protecting such stoppages, they are likely banned by the language of PLAs. One possible solution to this problem is to allow stoppages over safety, but allow them to be reviewed by a neutral party to determine whether they are over safety conditions or instead a pretext for other issues.[34]

### Grievance and arbitration procedures

Most PLAs reviewed for this research contain the three-step grievance/arbitration procedure contained in the BCTD model, either to the letter or with minor modifications for time limits, arbitrator selection, etc. Nearly one-quarter of the agreements, however, contain no special grievance/arbitration procedure, but state instead that grievances should be handled "per applicable local collective bargaining agreements." A few PLAs require—as does a Wisconsin PLA—that the parties use the procedures in local agreements but provide a dispute resolution mechanism "[i]n the event of a dispute arising under or concerning this Agreement, or if a local collective bargaining agreement does not contain a grievance/ arbitration procedure." A Michigan PLA includes a grievance/arbitration procedure, but specifically exempts electrical

## *PLA item checklist*

Although there is still no comprehensive guide to negotiating a PLA, the following checklist could help parties considering the development of a PLA.[46]

1. Purpose
   - If there is a specific date by which the project must be completed, and is it included?
   - Is the need for harmonization of hours and the stabilization of wages mentioned?
   - Is the need for the maintenance of labor peace mentioned along with a dedication to the mutual resolution of disputes?
   - Does the clause contain a no-strike/no-lockout statement?

2. Scope of agreement
   - Is it clear that the PLA is intended only to cover construction work?
   - Is work that is not included clearly stated?
   - Are the various projects and geographic parameters of the site well defined?
   - Does language address site preparation and/or dedicated offsite work?
   - Does the clause clearly state that all contractors, of whatever tier, must accept and be bound by the agreement through a letter of assent?
   - Does the agreement clearly state that the property owner's employees are not covered and the PLA does not create joint-employer status?
   - Is there a supremacy clause stating that the PLA supersedes all other agreements?

3. Union recognition
   - Are the signatory unions recognized as the sole and exclusive representatives of all craft employees?

4. Management's rights
   - Is management specifically given the right to hire, promote, transfer, lay off, or discharge employees, subject only to the provisions of the agreement?
   - Is just cause protection granted?
   - Are restrictions on output, crew size, or the introduction of technology prohibited?

5. Referral of employees
   - Do signatories agree to use the referral procedures maintained by the unions?
   - Is there a provision for unions that do not have an established referral system?
   - Is there a nondiscrimination clause in the agreement?
   - Is there a period (e.g., 48 hours) after which contractors may seek labor from other sources if the union is unable to fulfill a request?
   - Is there language relating to the appointment of foremen?
   - Does the agreement allow for testing or evaluation for those who require special skills?
   - Is there a "key man" or core personnel provision?
   - Is there a clause that prohibits the union from reassigning project employees to another site?
   - Is there a provision for the reemployment of individuals who quit or are terminated for cause, e.g., ineligibility to return to the site for 90 days?

6. Apprentices and trainees
   - Is there language about the employment of apprentices?
   - Does the PLA allow for a uniform journeyman/apprentice ratio?

- Are helpers, trainees, or other sub-journeymen allowed on the project?
- Is the ratio of these other trainees defined?
- Are apprentice or trainee wages defined in the PLA?
- Does the PLA establish any special program for the recruitment or training of apprentices or other trainees, such as minority or female targeting, or a school-to-work program?

7. Wages and benefits
   - Does the PLA contain any direct concessions on wages?
   - Does the PLA contain any direct concession on overtime pay?
   - Does the PLA limit forms of premium pay, such as travel time, high time, etc?
   - Does the agreement limit the joint funds to which contractors must contribute?
   - Does the agreement limit amounts to be contributed to straight-time wages?

8. Work rules
   - These are unique to each project, but may include such matters as rules on the use of equipment, smoking, absenteeism, etc. Often this section is used as a residual category for items that do not fit easily into other sections.

9. Work stoppages and lockouts
   - Is there strong language prohibiting strikes and lockouts, as well as other types of job actions, e.g., slowdowns?
   - Is striking allowed over certain matters, such as delinquency in payments to joint funds?
   - If striking is allowed, is it limited in any way (e.g., must not be accompanied by picketing, hand billing, etc.)?
   - Is notice required for striking?
   - Is there a procedure for determining if a proscribed job action has occurred, and for enforcing the no-strike/no-lockout clause?

10. Grievances and arbitration
    - Does the agreement contain a grievance and arbitration procedure?
    - Are arbitrators named in the PLA?
    - If not, is the source of arbitrators (e.g., AAA, FMCS) defined?
    - Does the agreement define the types of disputes or grievance that are subject to the procedure?
    - Are exceptions made to the grievance/arbitration procedure for industries that have their own settlement procedures?
    - Is the procedure, including the number of steps and individuals involved, clearly defined?
    - Is the employer allowed access to the grievance procedure?
    - Are limits to the arbitrator's authority defined?

11. Jurisdictional disputes
    - Does the PLA reference the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry?
    - Is a provision made for parties that are not stipulated to the plan?
    - Are pre-job conferences required to work out jurisdictional issues?

12. Union security
- Is there a requirement to join the appropriate union within the statutorily defined period?
- Is there a maintenance of membership provision?
- Is an exception made if the project is in a "right-to-work" state?

13. Union representation
- Is provision made for access to the project by union officials?
- Are the rules for union access defined?
- Are rules governing stewards defined?

14. Hours of work
- Is the workday defined?
- Are hours of work standardized across crafts?
- Are break times defined?
- Are any statements about overtime or overtime distribution included?
- Are there provisions for shift work and/or flex time?
- Are uniform holidays specified?
- Are rules concerning the celebration of holidays that fall on weekends defined?
- Is there a provision for make-up time?

15. Subcontracting
- Is subcontracting restricted to those willing to sign a letter of assent?

16. Safety and health
- Are any special safety programs or safety committees specified in the agreement?
- Are employees required to receive special safety training or be certified in particular safety procedures?
- Is a drug and alcohol abuse monitoring or prevention program specified?
- Is immediate dismissal allowed for safety violations?

17. Saving clause
- Does the clause preserve the contract if any particular provision is voided by a court of law?
- Does the clause require the parties to negotiate a substitute agreement for any provision voided under law?

18. Term of agreement
- Are the start and end dates of the project clearly defined?
- Is there a provision for rework or a contractor's subsequent involvement with the project?

## *Summary*

PLAs have historically been an agreement between unions and owners, with contractors only becoming involved in the PLA when they win a project bid. An alternative is for unions and contractors to develop a standard PLA that is then used as the foundation for a final PLA that is negotiated with owners. An advantage of this latter approach is that it is in keeping with the deepening of labor/management cooperation in construction and serves to promote the use of PLAs. Further, as demonstrated in the case of the Illowa Construction LMC, contractors will often use the PLA as a means of marketing their services. Finally, in addition to promoting efficiencies, a model PLA created by unions and contractors may provide a foundation for dispute resolution through an LMC.