# Expert Report
# of Dale Belman, Ph.D

# Exhibit IX-2

**ELECTRI International**
*The Foundation for Electrical Construction, Inc.*

# Project Labor Agreements

**Michigan State University**
*Dale Belman, Ph.D.*

**University of Rhode Island**
*Matthew M. Bodah, Ph.D.*

**University of Utah**
*Peter Philips, Ph.D.*

# Table of Contents

Executive Summary .................................................................................................................. 1

Introduction ............................................................................................................................. 5

1. Background ........................................................................................................................ 7
    What is a PLA? ................................................................................................................... 7
    How are today's PLAs different? ....................................................................................... 9
        Old school PLAs ............................................................................................................ 9
        Stop-loss PLAs ............................................................................................................. 10
        Market-share PLAs ..................................................................................................... 10
    But why the controversy? ............................................................................................... 11
    What do we know about the effects of PLAs? ............................................................... 13
    PLAs and bidding ............................................................................................................ 13
    PLAs effect on bid price .................................................................................................. 14
    PLAs and human resource outcomes: compensation, strikes,
        safety and minority employment ............................................................................... 14
    Conclusions ..................................................................................................................... 15

2. The Content of PLAs ....................................................................................................... 17
    Cost containment provisions .......................................................................................... 17
        Wages .......................................................................................................................... 17
        Premium pay ............................................................................................................... 17
        Benefits ....................................................................................................................... 17
        Pay for time not worked ............................................................................................ 18
        Work rules .................................................................................................................. 18
    Provisions effecting scheduling ...................................................................................... 18
        No-strike/no-lockout and dispute settlement provisions ......................................... 20
        Safety, training, and minority employment .............................................................. 20
    Critical miscellaneous provisions ................................................................................... 21
    A PLA checklist ................................................................................................................ 23

3. Interviews ........................................................................................................................ 27
    Positive comments .......................................................................................................... 27
        Scheduling .................................................................................................................. 27
        Safety .......................................................................................................................... 29

Costs ........................................................................................................................29
General comments ...............................................................................................30
Negative comments ..............................................................................................31
   The effect of PLAs on local labor relations ..............................................31
   The effect of PLAs on bidding and costs ..................................................32
When is a PLA appropriate? ................................................................................33
Improving PLAs .....................................................................................................33

4. Bidding and Costs ..................................................................................................35
Bidding behavior ....................................................................................................35
Costs ......................................................................................................................36

5. Case Studies ...........................................................................................................39
Route I-15 in Utah ................................................................................................39
Toyota assembly plant in San Antonio .................................................................47
T.F. Green Airport terminal ..................................................................................50
East Side Union High School District ..................................................................53

Principal Findings .........................................................................................................61

Footnotes ......................................................................................................................63

# Executive Summary

Project labor agreements (PLAs) are prehire collective bargaining agreements that establish the terms and conditions of employment on one or more construction projects. PLAs are typically the product of negotiations between a group of unions, usually represented by a building, construction trades' council and the representative of a construction user, most often a construction management firm. Unlike local construction collective bargaining, contractors and contractor associations have little or no role in such negotiations. PLAs require all contractors working on a project to adhere to collectively bargained terms and conditions of employment, whether they are normally union or nonunion contractors. PLAs have undergone considerable evolution over the years. Once used almost exclusively on very large projects that were either extremely isolated or that overwhelmed the capacity of the local construction labor market, PLAs are now used on a variety of private and public projects.

The use of PLAs in the public sector has raised questions about possible conflicts with state or local bidding regulations. As a result, all branches and levels of government have become involved in the controversy, which, in turn, has drawn both media attention and spurred a fair amount of research. However, as our review shows, most of the research is of low quality and little use in determining whether PLAs actually affect bidding behavior, wages, construction costs, etc.

The current report is possibly the broadest ranging and most detailed study of PLAs conducted to date. While prior studies have focused on a particular PLA project and addressed one or two narrowly defined issues, in this study we examine a large number of projects using a variety of techniques, including archival research, interviews, case studies and the statistical analysis of original data.

We ask a number of questions, including the following: What is a PLA? How do PLAs differ? What does prior research tell us about the effects of PLAs on construction projects? How do individuals with experience with PLAs view these agreements? How do PLAs affect the outcomes of construction projects? In what ways can PLAs be used to address the strategic needs of a project?

There are several central findings of this study. Perhaps most important, we find that there is no substantial evidence that PLAs decrease the number of bidders or change the costs of construction projects. Although our findings run contrary to prior research, we believe that most previous studies failed to account for important influences on construction costs. Therefore, effects were falsely attributed to PLAs that actually belonged to unobserved variables.

We arrived at our conclusions on bidding behavior by studying two adjacent school districts in San Jose, California. Both began extensive school construction in 2002. In 2004, one school district

signed a PLA, while the other did not. While the number of bids per bid opening decreased after the PLA in the former district, they also decreased in the district that did not sign a PLA. The decrease in bids was better predicted by an increasingly busy construction market than the existence of the PLA.

To examine cost effects, we studied 108 school projects in New England. We found that such variables as the building's size, the need for a new boiler, the construction of an auditorium, the construction of library and where the school was located had positive effects on construction costs. There is no evidence that a PLA either raised or lowered the costs of the projects studied.

We argue that if PLAs are cost neutral, then other reasons for using or not using PLAs must be examined. Through interviews and case studies, we found that users favored PLAs to reduce some of the uncertainty inherent in large scale construction projects. Obviously, no one can control the weather, and material shortages are always a concern. But construction users felt a PLA would ensured a steady flow of highly qualified labor. The flow of labor was guaranteed by the nationwide referral systems maintained by unions; the steadiness of the flow was buttressed by no-strike agreements, which are a nearly universal item in PLAs. Construction users told us that PLAs were particularly attractive on large projects that needed to be completed on a tight schedule. PLAs can be used to harmonize hours and holidays across the trades and to modify shifts and work schedules to meet the needs of construction users.

Although we lack good data on safety outcomes, interview evidence suggests that safety inputs are greater on PLA projects. Often PLAs include language establishing labor/management committees that deal specifically with safety and health issues.

PLAs may also be crafted to achieve wider social ends, such as increasing minority employment and participation on projects by minority business enterprises. As in a case study of the East Side Union High School district in San Jose, PLAs may also be used to create highly developed structures for training and recruiting young workers into the building trades, a critical need in light of the reported looming skills shortage in the industry.

A possible downside of PLAs is their effect on local labor relations. Some interviewees told us that power relations at the bargaining table may be skewed when too much work is covered by PLAs and their accompanying no-strike/no-lockout clauses. With workers protected from job actions, compromises in local bargaining may be harder to affect, leading to unusual settlements and protracted negotiations.

Another problem with PLAs is the general lack of contractor participation in bargaining. This sometimes leads to the needs of an industry not being addressed in an agreement. One complaint of local electrical industry representatives is that most PLAs do not allow them to use their longstanding, bipartite system of dispute resolution.

A possible solution to the problem, and one that is used in many areas, is to develop model PLA language through standing labor/management committees, which can be established as Taft-Hartley trusts and supported through per capita assessments on work. Typically, contractor organizations have high levels of participation on such committees.

Most interviewees agreed that PLAs are not suited to every project in every location. In considering whether to use a PLA, owners usually consider the importance of scheduling, the size of the project, the need for skilled labor, whether there are a sufficient number of union contractors in the major trades needed for the project to support competitive bidding and whether the work is likely to be done by union contractors with or without the PLA. In general, larger and more complex projects, for which scheduling is important, are good candidates for the use of a PLA.

PLAs are valuable tools for the construction industry because they can be used to create the conditions needed for a superior construction project. More than one hundred PLAs were reviewed for this study. The provisions of those agreements varied widely. The most sophisticated agreements had been crafted to address project specific issues such as local hiring, scheduling, work rules, employment of minorities, or the staffing of projects. We also found many bare bones PLAs that were little more than no strike/no lockout agreements. Based on our review of these agreements, and the findings of this research, we believe that there is great potential, much of it unrealized, for using PLAs to improve construction projects and promote union construction. Realizing this potential will require the education of contractors, construction users, and union officials on how PLAs can be crafted to promote the interests of all parties and provide better construction outcomes.

# 2. The Content of PLAs

Before analyzing the effects of PLAs, the contents require explanation. There are two model agreements adopted by the AFL-CIO's Building and Construction Trades epartment and approximately one hundred actual PLAs covering projects in 17 states.

Two categories of PLA provisions are clearly designed to promote cost savings on projects. The first category primarily includes compensation concessions on wages, benefits, premium pay and pay for time not worked (e.g. breaks). The second type of provision seeks to contain cost by enhancing productivity by relaxing work rules, minimizing crew sizes and restricting the introduction of new technology, among other things.

## Cost containment provisions

### Wages

Direct wage concessions in PLAs are rare. Most PLAs simply incorporate the wage schedules from local collective bargaining agreements. These are usually called Schedule A agreements, with Schedule A being the first contract appendix. However, a PLA occasionally will call for a trades' more favorable wage schedule to be used (e.g. residential rates on a commercial project). Less common is a separate wage schedule with different pay rates and different timings for pay increases.

Though rare, across-the-board wage concessions are possible and were more common during the recession of the early 1990s. A PLA for a building project at a private college in Rhode Island, for example, stated that "All employees covered by this agreement shall be classified in accordance with work performed and paid at the rate of eighty percent (80%) of the base hourly wage rates for those classifications…"

A more common concession is a wage freeze for the life of a project. A Connecticut PLA read, "The wage rates will be frozen as of September 1, 1998 for the remainder of the project. Fringe benefits shall not be frozen during this period."

### Premium pay

PLAs often limit the types of premium pay available on a project. A New Jersey PLA allowed for reporting and call back pay but otherwise held "there shall be no premiums, bonuses, hazardous duty, high time or other special payments of any kind." Similarly, overtime may be limited. A Connecticut PLA called for time-and-one-half to be paid after "ten hours worked in a day or forty hours worked in a week." Area agreements required premium pay after eight hours of work.

### Benefits

We discovered two approaches in PLAs to limiting benefits' costs. Most common, PLAs restrict the payments required of contractors to those funds that directly benefit employees. An Oregon agreement stated that "The employer shall pay only fringe benefit funds for employees (such as pension, health and welfare, vacation, apprenticeship and the like) that have been legally negotiated and established by the applicable collective bargaining agreement…This expressly excludes any and all Industry Promotion Funds, Contract Administration Funds, Contractor-Union Management Funds, Craft of

Industry Alliance of Associations."

A clause in a New England PLA limited premium contributions (for most trades) to the straight time rate, regardless of whether work was being performed at straight time or premium rates.

### Pay for time not worked

A clause from a New York PLA stating, "There will be no rest periods, organized coffee breaks or other non-working time established during working hours" is typical. Some PLAs specifically allow workers to bring beverage containers to their workplace for brief individual pauses. Except for lunch breaks, pay for time not worked is often limited by PLAs.

### Work rules

PLAs generally include broad proscriptions on practices that would, in any way limit productivity. Consider the following two sections from an Indiana PLA:

---

*Section 1: There shall be no limit on production by workers nor restrictions on the full use of tools and equipment. There shall be no restriction, other than may be required by safety regulations, on the number of employees assigned to any crew or to any service. ...*

*Section 7: The Union will not impose conditions which limit or restrict production or limit or restrict the joint or individual working efforts of employees. The Construction Contractor may utilize any method or technique of construction, and there shall be no limitation or restriction regardless of source or location of machinery, precast tools, or other labor-saving devices, nor shall there be any limitation upon choice of materials and design.*

---

### Provisions effecting scheduling

As the interview portion of this research reveals, one of the primary reasons that construction users agree to PLAs is their effect on scheduling. It is particularly significant when a project has a tight deadline, such as completion before the start of a school year or sports' season. Nearly all PLAs include in the preamble some mention of the need for timely completion. This mention may be general or very specific.

As well, PLAs usually reconcile the often disparate work schedules of the trades. PLAs specify standard start, quit and break times, and most PLAs note a uniform set of holidays. The following language is from a Minnesota PLA and addresses a number of scheduling issues.

---

*Article VIII*
*Hours of Work, Overtime, Shifts and Holidays*

*8.1 The regular forty (40) hour work week will start on Monday and conclude on Friday. Eight (8) consecutive hours, exclusive of a one-half (1/2) hour lunch period, between 7:00 a.m. and 5:00 p.m. shall normally constitute a work day. The starting time of the Work may be changed within these hours by the Employer upon notification to the Union to take advantage of daylight hours, weather conditions, shift, or traffic conditions. It is understood that all work performed in excess of eight (8) hours per day shall be considered overtime. Starting time may be adjusted up to one (1) hour prior to 7:00 a.m. with mutual consent of the Union and Employer.*

*8.2 At the scheduled starting time, all employees will be at the place where they pick up*

their tools or receive instructions from their foreman. They shall remain at their place of work under the supervision of the Employer until the scheduled quitting time. There shall be no practices that result in starting work late in the morning or after lunch or in stopping work early at lunch time or prior to the scheduled quitting time. Coffee breaks will be limited to ten (10) minutes and shall be taken in close proximity to the Employee's Work Station. The parties are in accord that the intent of the Agreement is a "fair day's work for a fair day's pay" and Work should be managed in such a manner to enable the Employer to maintain and increase efficiency consistent with fair labor standards.

8.3 When employees leave the Work on their own accord at other than normal quitting time, it is their responsibility to notify the Employer. Employees will be paid only for actual hours worked.

8.4 The Employer shall determine the recording devices, checking systems, brassing or other methods of keeping time records on the Work.

8.5 An effort will be made to keep overtime work to a minimum but when such is judged necessary it will be worked at the direction and discretion of the Employer.

8.6 All overtime to be paid at time and one-half except on Sunday and Holidays which will be paid as specified in Local Union Bargaining Agreements

8.7 All employees shall be paid for actual time worked. The Employer shall have sole responsibility to determine availability of work due to weather conditions.

8.8 Shift work may be performed at the option of the Employer. In the event the second or third shift of any regular work day shall extend into a holiday, employees shall be paid at regular shift rates. Shift work shall be paid as specified in local collective bargaining agreements. When so elected by the Employer, multiple shifts of a temporary basis, shall be worked the number of consecutive days required by the Local Union Bargaining Agreement.

8.9 Uniform holidays for the Agreement are as follows: New Year's Day, Good Friday, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, the Friday after Thanksgiving, Christmas Eve Day and Christmas Day. If any of these holidays fall on a Saturday or Sunday, the preceding day, Friday, or the following day, Monday, shall be considered to be a legal holiday. A holiday shall be a 24-hour period commencing with the established starting time of the day shift on the date of the holiday.

8.10 When work is to be performed in controlled areas, the Employer may elect to have the employees take two (2) one-half hour breaks instead of two (2) ten minute coffee breaks and a one-half hour lunch period.

### No-strike/no-lockout and dispute settlement provisions

Perhaps most importantly, PLAs insulate work on a project from disruptions that might occur because of labor relations issues or grievances.

Some no-strike/no-lockout provisions are very broad and preclude all types of actions. Others provide a narrow exception that allows striking if a contractor is delinquent in its payments to benefits' funds. The BCTD model PLA allows for disciplinary action—including ineligibility for rehire for ninety days—for any individual who violates the no-strike provision.

To ensure that disruptions do not occur or are dealt with swiftly, PLAs often contain several types of dispute settlement mechanisms. First, many PLAs, following the BCTD model, have a three step grievance procedure ending in binding, neutral third-party arbitration. This procedure handles typical complaints of contract violations. Second, PLAs often have some method of resolving jurisdictional disputes. Most PLAs simply refer matters to the BCTD's plan for the settlement of jurisdictional disputes in the construction industry. Some, however, contain their own procedures for resolving such disputes, particularly for cases where a non-BCTD union or employer who does not agree to use the plan is involved. Clear language in the scope of work provision and requirements for pre-bid or pre-job conferences are also ways of avoiding jurisdictional problems.

Many PLAs also have expedited procedures to handle job actions if they do occur. Typically, an arbitration hearing is held quickly with an immediate finding as to whether a job action has taken place. If one has, injunctions are authorized and penalties may be handed out to the offending individuals, unions or employers.

### Safety, training and minority employment

All of the PLAs reviewed for this research mention the need to adhere to safe work practices. In some cases, these are fairly brief statements calling for adherence to contractor's safety rules and OSHA or state safety regulations. Drug testing policies are also a nearly universal item.

It is not uncommon, however, for safety clauses to be much more highly-developed and include, among other things, labor/management committees and mandatory testing on safety protocols. Rather than being included in the PLA itself, a project safety plan is often a separate document altogether.

Since PLAs typically cover large projects that last for several years, they provide excellent opportunities for training initiatives. Changes in the journeyman/apprentice ratio, the inclusion of pre-apprenticeship programs and even programs to set aside a portion of worksite for training are possibilities. An Indiana PLA, for example, stated that apprentices and non-journeymen may be "up to forty percent (40%) of a craft's workforce...unless the local collective bargaining agreement establishes a higher percentage."

A New York PLA provides a good example of a pre-apprenticeship program. In this case, pre-apprentice opportunities were provided to "students of the City of Buffalo's Vocational High Schools." The PLA stated that students "shall perform 'hands-on' work in the following trades: carpentry/drywall, taping, interior finishes/painting, electrical, plumbing, communication and low voltage cabling, masonry, HVAC, finish carpentry work and fire protection.

An extraordinary training program was part of the PLA for British Columbia's Island Highway. The centerpiece of the effort was the Hindoo Creek project, a section of highway built by trainees. As reported by Cohen and Braid, "Time spent on the job was strictly on actual production. 'I wasn't just pushing barrels around from one side of a training yard to another,' one trainee explained, 'I was doing real work.'" [22]

The Hindoo Creek project was part of an effort to recruit women and minorities into construction.

Targets and local hiring initiatives are also means of increasing minority participation under PLAs. A Connecticut PLA, for example, required that local residents be given first hiring preference, followed by those in neighboring communities. A New Jersey PLA stated that "up to 50% of the apprentices placed on this project shall be first year, minority, women or economically disadvantaged apprentices as shall be 60% of the of the apprentice equivalents…"

## Critical miscellaneous provisions

Several other distinctive aspects of PLAs deserve mention. The Scope of Agreement provisions are highly detailed in PLAs. In order to avoid conflicts over what work the PLA covers and does not cover, the PLA project must be well defined. The following is an example from the Boston Harbor project.

The Management Rights clause in nearly all PLAs includes the rights to "hire, promote, transfer, layoff or discharge for just cause." The latter part of the provision bears special notice, since many local agreements in the construction industry do not include a just cause provision. However, these are typical in PLAs and balance with the dispute settlement procedures as a means of resolving just cause issues.

PLAs generally require all contractors on a project to use the referral system that is specified in the PLA or those included in local agreements. Some PLA referral mechanisms allow nonunion contractors to bring some of their own workers onto a project. These are called core personnel, key man or drag along provisions. For example, a western New York State PLA provides an illustration. It read, "In addition, the Contractor may hire, per craft, five (5) journeypersons referred by the affected trade or craft and may the hire one (1) core employee as a journeyperson who has been regularly employed by that Contractor for a reasonable time."

---

*Such Project is generally described as the construction of the following:*

*1) Primary, secondary and residual wastewater treatment facilities on Deer Island*
*2) Head works on Nut Island*
*3) A tunnel under Boston Harbor from Nut Island to Deer Island*
*4) An outflow tunnel eastward in the Atlantic Ocean from Deer Island, including the installation of diffusers*
*5) Related facilities, which include, as necessary the following:*
   *a. Site preparation, demolition and/or rehabilitation of facilities now located on the site*
   *b. Designated materials and personnel loading and unloading and staging sites dedicated to the Project*
   *c. Transportation systems in and around the Harbor for personnel and materials*
   *d. Installation of materials necessary for the Authority's Deer Island facilities, not otherwise undertaken by public or private utility organizations, in the town of Winthrop*
*6)  The interim and permanent sludge treatment plants at FSRA*
*7)  New construction/rehabilitation work for the Authority's current operating facilities on Deer Island and Nut Island awarded after the effective date of this agreement*

Finally, the term of agreement or duration clause is critical. Such clauses are much more complex in PLAs than in local agreements. Rather than the typical three or four year termination dates, PLAs must have detailed language concerning a project's completion. Without such language, disputes may arise as whether subsequent work is covered by the PLA. The following illustration comes from a Nevada PLA and shows the detail of such clauses:

---

### ARTICLE XVIII
### DURATION OF AGREEMENT

The Project Labor Agreement shall be effective on the date approved by the [owner], the Union and the General Contractor and shall continue until final acceptance, as defined in Section 1(b) of this Article, of the Project construction work described in Article II hereof.

Section 1:
(a)     Turnover. Construction of any phase, portion, section or segment of the Project shall be deemed complete when such phase, portion, section or segment has been turned over to the Owner by the Contractor and the Owner has accepted such phase, portion, section or segment. As areas and systems of the Project are inspected and construction tested and/or approved by the Construction Manager and accepted by the Owner or third parties with approval of the Owner, the Agreement shall have no further force or effect on such items or areas, except when the Contractor is directed by the Construction Manager or Owner to engage in repairs or modifications required by its contract(s) with the Owner or Construction Manager.

(b)     Notice. Notice of each final acceptance received by the General Contractor and/or Contractor will be provided to the Union with a description of what portion, segment, etc. has been accepted. Final acceptance may be subject to a 'punch list', and in such case, the Agreement will continue to apply to each such item on the list until it is completed to the satisfaction of the Owner and Notice of Acceptance is given by the Owner to the General Contractor and/or Contractor.

(c)     Termination. Final Termination of all obligations, rights and liabilities and disagreements shall occur upon receipt by the Union of a notice from the General Contractor or the Owner saying that no work remains within the scope of the Agreement for the General Contractor or its successor.

(d)     Releases/Waivers. Any and all releases and/or waivers shall be provided to the Owner.

---

# THE CONTENT OF PLAS

## A PLA checklist

The following table provides a comprehensive checklist of items for negotiators of PLAs. However, the list should not be a substitute for the important needs on a specific project. As chapter five states, the strength of PLAs is the ability to address these needs. The initial questions negotiators should ask are: What are the important issues on this project (e.g. cost, scheduling, safety, etc.)? How can the PLA be structured to handle these issues?

### Table 1: A PLA Item Checklist

**1. Purpose**
- If there is a specific date by which the project must be completed, is it included?
- Is the need for harmonization of hours and the stabilization of wages mentioned?
- Is the need for the maintenance of labor peace mentioned along with a dedication to the mutual resolution of disputes?
- Does the clause contain a no-strike/no-lockout statement?

**2. Scope of agreement**
- Is it clear that the PLA is intended only to cover construction work?
- Is work that is not included clearly stated?
- Are the various projects and geographic parameters of the site well-defined?
- Does language address site preparation and/or dedicated off-site work?
- Does the clause clearly state that all contractors, of whatever tier, must accept and be bound by the agreement through a letter of assent?
- Does the agreement clearly state that the property owner's employees are not covered and the PLA does not create joint-employer status?
- Is there a supremacy clause stating that the PLA supersedes all other agreements?

**3. Union recognition**
- Are the signatory unions recognized as the sole and exclusive representatives of all craft employees?

**4. Management's rights**
- Is management specifically given the right to hire, promote, transfer, lay off or discharge employees, subject only to the provisions of the Agreement?
- Is just cause protection granted?
- Are restrictions of output, crew size or the introduction of technology prohibited?

**5. Referral of employees**
- Do signatories agree to use the referral procedures maintained by the unions?
- Is there a provision for unions that do not have an established referral system?
- Is there a non-discrimination clause in the agreement?
- Is there a period (e.g. 48 hours) after which contractors may seek labor from other sources if the

union is unable to fulfill a request?
- Is there language relating to the appointment of foremen?
- Does the agreement allow for testing or evaluation for those who require special skills?
- Is there a "key man" or core personnel provision?
- Is there a clause that prohibits the union from reassigning project employees to another site?
- Is there a provision for the reemployment of individuals who quit or are terminated for cause (e.g. ineligibility to return to the site for 90 days)?

### 6. Apprentices and trainees
- Is there language about the employment of apprentices?
- Does the PLA allow for a uniform journeyman/apprentice ratio?
- Are helpers, trainees, or other subjourneymen allowed on the project?
- Is the ratio of these other trainees defined?
- Are apprentice or trainee wages defined in the PLA?
- Does the PLA establish any special program for the recruitment or training of apprentices or other trainees (such as minority or female targeting, a school-to-work program, etc.)?

### 7. Wages and benefits
- Does the PLA contain any direct concessions on wages?
- Does the PLA contain any direct concession on overtime pay?
- Does the PLA limit forms premium pay, such as travel time, high time, etc?
- Does the agreement limit the joint funds to which contractors must contribute?
- Does the agreement limit amounts to be contributed to straight time wages?

### 8. Work rules
- These are unique to each project, but may include such matters as rules on the use of equipment, smoking, absenteeism, etc. Often this section is used as a residual category for items that do not fit easily into other sections.

### 9. Work stoppages and lockouts
- Is there strong language prohibiting strikes and lockouts, as well as other types of job actions (e.g. slowdowns)?
- Is striking allowed over certain matters, such as delinquency in payments to joint funds?
- If striking is allowed, is it limited in any way (e.g. must not be accompanied by picketing, handbilling, etc.)?
- Is notice required for striking?
- Is there a procedure for determining if a proscribed job action has occurred and for enforcing the no-strike/no-lockout clause?

### 10. Grievances and arbitration
- Does the agreement contain a grievance and arbitration procedure?
- Are arbitrators named in the PLA?

- If not, is the source of arbitrators (e.g. AAA, FMCS) defined?
- Does the agreement define the types of disputes or grievance that are subject to the procedure?
- Are exceptions made to the grievance/arbitration procedure for industries that have their own settlement procedures?
- Is the procedure, including the number of steps and individuals involved, clearly defined?
- Is the employer allowed access to the grievance procedure?
- Are limits to the arbitrator's authority defined?

### 11. Jurisdictional disputes
- Does the PLA reference the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry?
- Is a provision made for parties that are not stipulated to the Plan?
- Are pre-job conferences required to work out jurisdictional issues?

### 12. Union security
- Is there a requirement to join the appropriate union within the statutorily defined period of time?
- Is there a maintenance of membership provision?
- Is an exception made if the project is in a "right-to-work" state?

### 13. Union representation
- Is provision made for access to the project by union officials?
- Are the rules for union access defined?
- Are rules governing stewards defined?

### 14. Hours of work
- Is the workday defined?
- Are hours of work standardized across crafts?
- Are break times defined?
- Are any statements about overtime or overtime distribution included?
- Are there provisions for shift work and/or flex time?
- Are uniform holidays specified?
- Are rules concerning the celebration of holidays that fall on weekend defined?
- Is there a provision for make-up time?

### 15. Subcontracting
- Is subcontracting restricted to those willing to sign a letter of assent?

### 16. Safety and health
- Are any special safety programs or safety committees specified in the agreement?
- Are employees required to receive special safety training or be certified in particular safety procedures?
- Is a drug and alcohol abuse monitoring or prevention program specified?
- Is immediate dismissal allowed for safety violations?

### 17. Saving clause
- Does the clause preserve the contract if any particular provision is voided by a court of law?
- Does the clause require the parties to negotiate a substitute agreement for any provision voided under law?

### 18. Term of agreement
- Are the start and end dates of the project clearly defined?
- Is there a provision for rework or a contractor's subsequent involvement with the project?

And second of all, our students have exposure to construction. They know what they're getting into. So the unions know these applicants to their apprenticeship programs are serious.

Because the PLA is new and the Construction Technology Academy program takes four years to

---

*PLA language on the East Side district's construction academy*

*In order to facilitate the goals of the Academy, the [School] District and [Building Trades] Council agree to create a steering committee, which will conduct meetings at least once a month during the district academic year to develop the goals of the Academy; plan for the presentation and content of training lectures to facilitate employable skills in the construction trades; develop a summer schedule for training; organize and develop summer internship positions; assist in planning curriculum scope and sequencing; design co-curricular activities; identify sources for educational and financial support; and otherwise initiate steps to carry out the goals of the Academy. The committee shall consist of sixteen (16) members, of whom five members shall represent the trade JATC's [Joint Apprenticeship Training Councils], three members of the Building Trades Council, six members from the district, including one member who shall be from district management and one member from a community college district. The district management representative shall be the presiding officer of the steering committee. The steering committee shall make recommendations to the district administration. The Academy Steering Committee, in coordination with the district's career services representative, shall develop and implement a plan for annual assessment of the goals and objectives of Appendix B in order to maximize the employability of the summer interns described below.*

*1) Annual Training Summer Sessions. Annual summer intern training sessions developed by the Academy Steering Committee shall be made available for qualified district students nominated by the district.*

  *a) Purpose of Summer Training Sessions. The purpose of the summer intern training sessions is to teach the interns employable skills in the construction trades. The skill sets to be taught by the District shall, in part, include materials taken from a curriculum known as "SCANS," which identifies and teaches such general employability skills as dependability, responsibility, working with other people, active listening (i.e., receiving and responding to instruction), organizing work tasks and utilizing technology. The other skill sets shall include the proper use of tools of the construction trades in addition to practical application of skills in the construction trades. The sessions shall include classroom and job visit components.*

  *b) Number of Interns. The goal for the summer program of 2003 shall be twenty (20) internships available for students nominated by the district. For the second year of the contract, the goal for internships available shall not exceed thirty (30) per calendar year.*

  *c) Number and Scope of Training Sessions. For the first year, the number of summer training sessions shall not be less than eight (8) in number. The scope of the training sessions, and the presenters, shall be developed by the Academy Steering Committee. For subsequent years, the scope*

*and presenters of the training sessions shall be as developed by the Academy Steering Committee. All training sessions shall be hosted by the Trade JATC's according to the scope developed by the Academy Steering Committee.*

*2) Employment of Interns. Beginning July, 2003, the Building Trades Council shall make arrangements for contractors working under the Project Labor Agreement to employ up to twenty (20) interns selected by the Academy Steering Committee. The interns shall be paid no less than $10.00 per hour for on-the-job training but not for periods of time attending the classroom training sessions. The sessions shall occur over a minimum of four and a maximum of five weeks for summer internship positions beginning in July 2004, the Program Manager agrees to endeavor to employ or make arrangements for the employment of up to thirty (30) paid intern positions of students selected by the district for the same time and rate of pay as for July, 2003. Each year thereafter, the goal shall be to employ up to thirty (30) interns at the same rate and for the same duration unless otherwise agreed to by the district and the council. The employment shall be practical and relevant to the apprenticeship requirements for the building trades, with emphasis on at least five major crafts selected by the Academy Steering Committee for each year of the contract. Due to safety, prevailing wage and related issues, the interns shall not be employed directly on the public works projects that are the subject of the Project Labor Agreement and this Appendix B.*

*3) Intern Program and Priority on California Apprenticeship Council Approved Program Apprenticeship Lists.*

*a) Establishment of an Intern Program through the Academy and Program Manager. An intern program for construction trades careers shall be developed by the Academy Steering Committee to help facilitate placement into a California approved apprenticeship program upon successful completion of the classroom coursework and the summer intern sessions.*

*b) Priority on Apprenticeship List. The training and employment program of the interns shall be developed by the Academy Steering Committee such that graduating interns shall possess the skills, training, and educational background to help the graduate achieve priority on the lists of the Building Trades Apprenticeship Programs for those which maintain a list and direct entry for those programs where direct entry is possible. It is recognized that the Apprenticeship Programs operate according to existing Standards approved by the Division of Apprenticeship Standards of the State of California Department of Industrial Relations and the standards set forth in the collective bargaining agreements for each building trade. Therefore, in order to maximize the opportunity that graduates may achieve a priority standing on an apprenticeship list or direct entry to an apprenticeship program, the Academy Steering Committee shall develop a plan for an annual assessment of the goals and objectives set out in this appendix B and in so doing, shall coordinate with the District's Career Services representative. The annual program assessment by the Academy Steering Committee shall follow the completion of each summer internship program.*

# Principal Findings

■ Project Labor Agreements (PLAs) have been used for many years, perhaps as early as World War I. However, the use of PLAs has changed over the years. Once reserved for very large, isolated or specialized projects, today PLAs are used on a wide range of projects.

■ PLAs are prehire collective bargaining agreements that cover the terms and conditions of employment on a specified construction project or set of projects. PLAs require that all contractors on a project, whether typically union or not, abide by collectively-bargained terms and conditions of employment, including paying union scale, using union referral systems, etc.

■ An essential difference between PLAs and area agreements is that the principal parties in most negotiations are the building trades' unions and representatives of construction users, rather than unions and contractors.

■ The use of PLAs on public sector projects has become increasingly controversial over the past 15 years. All levels and branches of government have been brought into the PLA dispute. Court cases during the period have generally been over the issue of whether a PLA violates state or local bidding laws or regulations.

■ The controversy over PLAs has spawned a number of studies on the effects of PLAs on the bidding behavior of contractors, construction costs, construction wages and several other issues. However, much of this research is flawed because of inherent difficulties in conducting such research, poor methodology or predetermined conclusions.

■ Our research on bidding behavior and costs finds that PLA neither decrease the number of bidders on a project nor increase or decrease a project's cost when other important variables are taken into account. However, previous studies that have found a strong positive effect of PLAs on project cost failed to account for other important variables and, as a result, inflated the presumed impact of a PLA.

■ Assuming cost neutrality, other aspects of PLAs should be considered. Interview and case study evidence finds high satisfaction with PLAs by stakeholders and suggests that PLAs can be used to improve scheduling, safety, training and minority employment.

■ A problem with PLAs in many areas is a lack of contractor participation in negotiations, which can lead to the needs of a specific industry being ignored. One solution, which is used in a number of jurisdictions, is the development of a model PLA through a standing labor/management committee.