**UNITED STATES DISTRICT COURT.**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ALLIED CONSTRUCTION INDUSTRIES, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 1:14cv450 |
| | ) | |
| vs. | ) | Judge Michael R. Barrett |
| | ) | |
| CITY OF CINCINNATI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## ORDER

This matter is before the Court on: 1) Plaintiff's Motion for Summary Judgment (Doc. 52); and 2) Defendant's Motion for Summary Judgment (hereinafter referred to as the "City") (Doc. 53); 3) Intervenor Local 265's Motion for Summary Judgment ("Local 265") (Doc. 55), 4) Local 265's Motion to Strike (Doc. 65); 5) Defendant's Motion to Strike (Doc. 74), and the responsive memoranda thereto.  This matter is now ripe for review.

## I.  FACTUAL OVERVIEW

The facts of this case are largely undisputed.  Plaintiff Allied Construction Industries ("ACI") is a not-for-profit trade association comprised of over 500 member companies who employ more than 25,000 individuals throughout the Greater Cincinnati area.  (Doc. 52-2, PageID 421, ¶ 4).  Its members include general contractors, subcontractors, architects, engineers, developers, material suppliers and service providers to the commercial construction industry, proving construction services for both public and private projects in southwest Ohio.  (*Id.*, PageID 421-22, ¶ 4).  Its members include both union and open-shop contractors.  *Id.*

In 2012, The City of Cincinnati enacted CMC Chapter 320, commonly referred to as the Responsible Bidder Ordinance ("RBO"); the RBO was amended to its current version in May 2013. Relevant to this case, the RBO affects the award of construction contracts for Greater Cincinnati Water works ("GCWW") and Metropolitan Sewer District of Greater Cincinnati ("MSD") projects valued over $400,000. ACI argues the Supremacy Clause, U.S. Const. art. VI § 2, and the preemption provision of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1144(a), prohibit the application of three provisions of the City's RBO when awarding its water works construction contracts. The three pertinent provisions concern apprenticeship requirements, the pre-apprenticeship training fund, and two of the lowest-and-best bidder factors.

The apprenticeship requirements in Section 320-5 of the CMC require bidders and the bidders' subcontractors to participate in an apprenticeship program for the primary apprenticeable occupation on the project that has graduated at least one apprentice from the apprenticeship program for each of the past five years. CMC 320-5. The apprenticeship requirement is inapplicable, however, a) if the construction contract is less than $400,000, and b) to a subcontractor that is a registered small business enterprise with the MSD or is a small business enterprise certified by the City, if the value of the subcontract with that subcontractor is under $250,000. CMC 320-5, 320-1-C1.

The pre-apprenticeship training fund provision in Section 320-7 of the CMC requires contractors[1] on GCWW and MSD projects to pay $.10 per hour per worker "for the purpose of funding qualified pre-apprenticeship programs that will create a pipeline of opportunities from recruitment to placement to retention." CMC 320-7. The payment "shall go into MSDGC Fund 701 where the project is managed by MSDGC and into water works Fund 101 where the project

---

[1] "Contractor" is defined in the RBO as "any person or company that has entered into a Construction Contract with the City." CMC 320-1C2.

is managed by water works."  *Id.*  The payments, however, may "not be taken from the fringe benefits of the contractor's employees."  *Id.*

The two lowest-and-best bidder factors in Sections 320-3(j) and (k) of the CMC require bidders on Cincinnati GCWW projects and MSD projects to certify whether they provide a health care plan and a pension or retirement program to their employees.  CMC 320-3(j), (k). Those provisions require that the contributions "be part of the employee's regular compensation and not merely part of the employee's compensation during the period of time for which the employee is performing work on the project."  CMC 320-3(j), (k).  Those certifications are factors considered by the City in determining the lowest and best bidder for a construction contract.  CMC 320-3.

A bidder not in compliance with these provisions will not be awarded water works construction contracts, as such a bid is considered unresponsive.  (Doc. 52-2, PageID 423, ¶ 16).

On June 30, 2014, the Court granted ACI's request for preliminary injunctive relief. (Doc. 15).  Consequently, the City was preliminarily enjoined from enforcing CMC 320-3(j) and (k), CMC 320-5, and CMC 320-7 in connection with specifically named pending projects, as well as other pending or future water works construction projections for which contracts had not been awarded.  *Id.* at PageID 188.  Bond was set at $1 million dollars, which was posted on July 3, 2014.  (Doc. 16).  In accordance with the order, the parties came to certain agreements relating to pending projects.  (Doc. 18).  Subsequently, on September 8, 2014, Local 265 sought to intervene in this case.  (Doc. 20).  The Court granted Local 265's Motion on November 24, 2014. (Doc. 34).

## II. EVIDENTIARY ISSUES

### A. Objections

Local 265 attaches to its Response to Plaintiff's Motion a list of objections to the affidavits of Terry Phillips and Steven Klinker.  (*See* Docs. 64-30, 64-31).  The City followed suit, and filed a separate document titled "Defendant's Evidentiary Objections to Plaintiff's Dispositive Motions."  (Doc. 71).

To be considered on a motion for summary judgment, an affidavit must satisfy three requirements: 1) it "shall be made on personal knowledge, 2) it "shall set forth such facts as would be admissible in evidence", and 3) it "shall show affirmatively that the affiant is competent to testify to the matters stated therewith."  Fed. R. Civ. P. 56(e).

Affidavits not in compliance with Rule 56(e) are subject to a motion to strike.  *Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F.Supp.2d 948, 954 (S.D. Ohio 2000).  The Court notes, however, that Local 265 and the City did not file motions to strike, but rather simply list their objections to various paragraphs of each affidavit.  Moreover, both parties provide little argument, if any, to accompany their evidentiary objections.  Because meeting the requirements of Rule 56(e) is mandatory, the Court addresses the objections raised.  The crux of their objections is that the contested paragraphs are not based upon personal knowledge or are not relevant, implicating two of the requirements under Rule 56(e).

 "In resolving a motion to strike, the Court should use 'a scalpel, not a butcher knife.' *Perez v. Volvo Car Corp.,* 247 F.3d 303, 315-16 (1st Cir.2001).  Thus, it is appropriate for the Court to strike portions of affidavits that do not satisfy the requirements of Rule 56(e)."  *Giles v. University of Toledo*, 241 F.R.D. 466, 469 (N.D. Ohio 2007) (citing 11 *James Wm. Moore, Federal Practice* § 56.14[1][d] (Matthew Bender 3d ed.), n. 46 and 47).

First, evidence is relevant if it has "any tendency" to make a fact "of consequence" more or less probable. Fed. R. Evid. 401. The threshold for relevance is low, and in fact the standard is "extremely liberal." *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009). Under the liberal Rule 401 standard, the Court concludes that the information in both affidavits is relevant.

In addition, affidavits may only include facts based on personal knowledge. Fed. R. Civ. P. 56(e). Personal knowledge may be inferred from the content of the statements. *Reddy*, 137 F. Supp.2d at 957 (citing 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.14[1][c] (3d ed. 1999). However, inferences, thoughts and opinions must be based on first hand observations or personal experience, substantiated by specific facts. *See Harrah's Entertainment, Inc. v. Ace American Ins. Co.*, 100 Fed. Appx. 387, 394 (6th Cit. 2004). Further, conclusions of law found in affidavits should not be considered on summary judgment. *Id.*

Turning to the present case, the affidavits of Phillips and Klinker each state that having been "duly cautioned and sworn, and states under oath based on personal knowledge as follows…" (Docs. 52-2, 52-3). Moreover, Phillips is the executive director of ACI, and Klinker is the former president of ACI, now the executive vice president of Dugan & Meyers Construction Company. *Id*. While the Court finds the majority of each affidavit in compliance with Rule 56(e), there are a few issues to address. Because Local 265 and the City did not file motions to strike, the Court addresses their objections only to the extent they are sustained. All other objections are overruled.

### 1. <u>Affidavit of Terry Phillips</u>

Paragraph 10 of the Phillips affidavit is stricken because he lacks personal knowledge to know whether the City amended the Apprenticeship Ordinance at the urging of Laborer's Unions. His opinion is not substantiated by specific facts.

Paragraph 16 is partially stricken – namely, the phrase "[a]s a penalty." The Court finds this to be an unsubstantiated legal conclusion. The remainder of Paragraph 16 stands.

### 2. <u>Affidavit of Steven Klinker</u>

Turning to Klinker's affidavit, Paragraph 14 is stricken for lack of personal knowledge. His opinion that the vast majority of water works projects within the City limits exceed $400,000 may very well be based on first hand observations or personal experience. From the information contained in the affidavit, however, the Court must conclude that this statement is not substantiated by specific facts, which would allow the Court to make such an inference.

### B. <u>Motions to Strike</u>

Local 265 and the City seek to strike four statements from the deposition of Plaintiff's expert, Andrew Jacobs, as legal conclusions that go to the ultimate issue in this case – whether ERISA preempts the RBO. While the Court does not disagree that some of Mr. Jacobs' opinions embrace the ultimate issue, such a finding is not automatically grounds for exclusion. Federal Rule of Evidence 704 states: "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. Thus, a Court may admit an expert opinion that embraces an ultimate issue when it is helpful to the trier of fact.

Nevertheless, Local 265 and the City take issue with a statement in Mr. Jacobs' deposition in which he said he was retained to provide a legal conclusion. Expert testimony may embrace the ultimate issue, but not provide an answer to the ultimate issue of law. *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). Despite initially stating that he was retained to provide an expert opinion on whether the contested provisions of the RBO are preempted by ERISA, ACI points out that Mr. Jacobs was quick to clarify his statement:

Q: So you were asked to opine as to whether these statutes are preempted?

> A: Well, actually, let me back off. I – I think I misspoke there. I was asked to opine as to how these statutes would impact an ERISA plan in terms of its benefit structure and otherwise, the impact of it. I was not necessarily asked to give a legal opinion on whether or not ERISA preempted these statutes. I was asked to opine on the impact of these statutes on the structure of the plans based on my experience working with plans over the last 22 years and working with clients and developing and designing plans and operating and administering them.

Jacobs Deposition, 17:10-22.

While the Court agrees that Mr. Jacobs may not opine as to whether the RBO is subject to preemption, much of Mr. Jacobs' testimony provides information about the policies, benefit structures and objectives of ERISA.  At times, he also explains how, in his opinion, the RBO would impact existing ERISA plans.  To the extent Mr. Jacobs ventures into the realm of providing legal conclusions, the Court is capable of parsing through Mr. Jacobs' testimony.  Therefore, the Court will disregard Mr. Jacobs' opinion to the extent that he opines on whether the RBO is preempted by ERISA.

Local 265 and the City next argue that Mr. Jacobs' testimony is unhelpful because he bases his opinion solely on his review of ACI's Complaint and this Court's prior opinion.  They also argue that Mr. Jacobs' opinions are speculative.  The Court finds that these arguments go to the weight and sufficiency of the evidence, not admissibility.  Accordingly, while the Court takes these arguments into consideration when determining how much weight to give Mr. Jacobs' testimony, the motions to strike are denied on these grounds.

### III. MOTIONS FOR SUMMARY JUDGMENT

#### A.  STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party has the burden of showing an absence of

evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). These standards upon which the court evaluates motions for summary judgment do not change simply because the parties present cross-motions. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

ACI argues that the Supremacy Clause, U.S. Const. art. VI § 2, and the preemption provision of ERISA, 29 U.S.C. § 1144(a), prohibit the application of the three aforementioned provisions of the City's RBO when awarding its water works construction contracts. ERISA is a federal law that regulates employee benefit plans. 29 U.S.C. §§ 1002-1461. "Congress enacted ERISA to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries' by setting out substantive regulatory requirements for employee benefit plans and to 'provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts.'" *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quoting 29 U.S.C. § 1001(b)) (alteration and ellipses in original). The statute seeks "to provide a uniform regulatory regime over employee benefit plans." *Davila*, 542 U.S. at 208. To promote that uniformity, ERISA contains a broad preemption provision that "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" falling within the regulatory scheme. 29 U.S.C. § 1144(a). The "employee benefit plans" referred to therein include those plans, funds or programs established or maintained by the employer or an employee organization, or both, for the purpose of providing its participants or beneficiaries, among other benefits, "medical, surgical, or hospital

care or benefits," "apprenticeship or other training programs," and "pension" or "retirement income." 29 U.S.C. § 1002(1)-(2).

Historically, it has been a challenging task for the courts to determine when a law "relates to" ERISA for the purposes of preemption. *See California Div. of Labor Standards Enforcement v. Dillingham Constr.* 519 U.S. 316, 324 (1997); *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-99 (1983). The Supreme Court, however, has provided a general framework to guide the analysis by defining a law that "relates to" an ERISA-covered plan as one that either 1) "references" such a plan or 2) has a "connection with" the plan. *Dillingham*, 519 U.S. at 324-25. To "reference" an ERISA plan, the law at issue must "act[] immediately and exclusively upon [the] ERISA plan[]" or the ERISA plan must be "essential to the law's operation." *Id.* at 325. To have the requisite "connection with" an ERISA plan, the law at issue must mandate (or effectively mandate) something, and that mandate must fall within the area that Congress intended ERISA to control exclusively. *Associated Builders & Contrs. v. Mich. Dep't of Labor & Economic Growth*, 543 F.3d 275, 281 (6th Cir. 2008) (citing *Dillingham*, 519 U.S. at 325).

**B. <u>ANALYSIS</u>**

**1. <u>Market Participant Doctrine</u>**

The City and Local 265 first argue that the provisions at issue are not subject to preemption because the City was acting as a market participant. The Court addresses this issue first, because if the RBO is proprietary in nature, ACI's arguments based on preemption fail.

The "market participant doctrine" was adopted in *Boston Harbor* and applied by the Sixth Circuit in *Michigan Bldg. & Const. Trades Council v. Snyder* ("*Snyder*"), 729 F.3d 572 (6th Cir. 2013). *Building & Construction Trades Council v. Associated Builders & Contractors*

*of Mass./R.I., Inc.*, 507 U.S. 218 (1993) ("*Boston Harbor*").  Under the doctrine, a public entity acts as a market participant if its action: 1) is intended to address proprietary concerns; and 2) is sufficiently tailored to address those concerns.  *Snyder*, 729 F.3d at 577-82.  The distinction being that when the government meets both requirements under the doctrine, the government entity is acting purchaser as opposed to a regulator.

The City and Local 265 argue that in passing the RBO, the City, as the proprietor of water works projects, was acting to advance its goals of efficient completion and safe construction with trained workers.  (Doc. 55-1, PageID 685).  To begin, the City and Local 265 cite. *Assoc'd Builders and Contractors, Inc. v. New Castle County*, 144 F. Supp.3d 633 (D. Del. Nov. 17, 2015) in support of their argument that the City was acting as a market participant. While the undersigned acknowledges that the facts in *New Castle* are similar, a District Court's decision in the Third Circuit is certainly not binding on this Court.  When considering the City's actions in this case, the Court finds a different conclusion is warranted than that in *New Castle*.[2]

ACI argues that much of the case law cited by Local 265 is distinguishable.  The Court agrees.  The first distinction ACI makes is actions taken by a municipality on a single project, such as a project labor agreement ("PLA"), and actions taken by a municipality in its government law-making authority.  (Doc. 63, PageID 1281).  In *Boston Harbor*, the independent government agency was tasked with cleaning up the Boston Harbor.  It hired an engineering company that served as the project manager.  The engineering company then negotiated a contract with the contractors that required a PLA.  The Court held that the PLA was not preempted by the NLRA because the agency acted as a market participant rather than as a government regulator.  In reaching that conclusion, the Court noted various distinctions between market participants and government regulators.  Among those distinctions were that the State was acting as "a market

---

[2] *New Castle* was decided on a motion for preliminary injunctive relief.  144 F. Supp.3d at 635.

participant with no interest in setting policy" and was performing a private role rather than a characteristically governmental role.  Of importance, at issue in *Boston Harbor* was the enforcement of one PLA negotiated by private parties for one specific project.

In *Snyder*, the Sixth Circuit found that the State of Michigan was acting as a market participant when it made an "across-the-board determination" that its contractors were not required to enter into PLAs for public construction projects. *Snyder*, 729 F.3d at 574.  The Sixth Circuit reasoned that because a private developer could make such a determination, the State of Michigan was acting as a market participant when it made the same determination.  *Id*.  However, of significance, whether a contractor enters into a PLA does not preclude a contractor from bidding on and receiving a construction contract.  Rather, PLAs establish the conditions of employment for each specific construction project.  *Snyder*, 729 F.3d at 574.  The Sixth Circuit in *Snyder* also found the effect on public projects limited.  *Id*. at 578.  In fact, in *Snyder*, the Michigan legislature specified that it intended the act to provide for fair and open competition. *Id*. at 576.

Local 265 also cites the Fifth Circuit's decision in *Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tex.*, 180 F.3d 686 (5th Cir. 1999), which has been adopted by the Sixth Circuit.  *See Petrey v. City of Toledo*, 246 F.3d 548 (6th Cir. 2001), abrogated on other grounds by *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002).  In that case, the Fifth Circuit posed two questions to answer when determining whether a government entity was acting as a market participant:  "First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances?  Second, does the narrow scope of the challenged action defeat

an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?"  180 F.3d at 693.

Here, the would-be effect on public projects is far reaching – "tantamount to a regulation," as explained in *Wisconsin Dept. of Industry, Labor and Human Relations v. Gould, Inc.*, 475 U.S. 282, 289 (1986).  That is, bidders must either follow the requirements of the RBO or they will not receive contracts for all water works construction projects over a specified value.[3]  Consequently, the effect of the RBO reaches further than protecting the City's private interests in the efficient use of its resources, as apparently intended by the City.  Instead, it controls the way in which contractors generally conduct their business, as discussed more fully herein.

Moreover, because the RBO does not address a specific proprietary problem, but rather, broad concerns regarding the City's interest in the efficient use of its resources, the Court cannot conclude that the City, in enacting the RBO, had no interest in setting policy, as the Supreme Court found in *Boston Harbor*.  For example, one intended purpose of the RBO, at least initially, was to "ensure that the contractors hired to work on these projects are in compliance with all federal, state, and local laws and that they provide their workers with fair compensation and benefits.[4]"  (Doc. 55-3, PageID 706).  Thus, although the City surely needs to procure goods and services to complete its water works projects, the City's actions do not defeat the inference that its primary goal was to encourage a general policy.

---

[3] It remains unclear from the evidence in the record to what extent projects valued below $400,000 exist, as the Court declines to consider Paragraph 14 of Klinker's Affidavit, as discussed above.  The answer to this question, however, is not determinative.
[4] This language was removed when the RBO was amended to its current version.

Accordingly, the Court finds that the RBO is not narrowly tailored to address proprietary concerns of the City. Thus, the City was not acting as a market participant when it enacted the RBO.

### 2. **The RBO**

ACI argues that the RBO is preempted because each provision has the requisite "connection with" an ERISA plan.[5] The City argues generally that the RBO is an indirect economic incentive because it does not mandate anything. The City further argues that even if the contested provisions of the RBO are mandates, they are not areas that Congress intended ERISA to control.

### i. **Apprenticeship Requirements (CMC 320-5)**

The City first argues that apprenticeship regulations and thus, Section 320-5 fall within the municipality's traditional police powers. To begin, the Court must acknowledge that "States have long regulated apprenticeship standards and training" and "fall[] well within [State's] traditional police powers." *Assoc'd. Builders & Contractors v. Michigan Dept. of Labor*, 543 F.3d 275, 282 (6th Cir. 2008) (citing *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 330–32, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997)). With that said, however, there are a couple of issues specific to the RBO in this case that the Court finds distinguishable from the Michigan statute at issue in *Associated Builders*.

ACI argues that the requirements of Section 320-5 preclude its members from effectively bidding on water works construction contracts, and interfere with ACI's ERISA-compliant apprenticeship plans so as to disturb the uniformity of its administration. With respect to the

---

[5] ACI focuses its attention on the "connection with" requirement, and does not address whether the RBO "references" an ERISA plan. Because the Court agrees that the RBO does not reference an ERISA plan, the Court limits its analysis to whether each contested provision of the RBO has a connection with an ERISA plan. (*See* Doc. 61-1).

mandate issue, ACI argues that Section 320-5 mandates a specific type of apprenticeship program participation as a condition of being considered a responsible bidder. The City argues that Section 320-5 mandates nothing, asserting that 'simple noncompliance" is an option because contractors face no penalty if they do not follow the apprenticeship requirements. In other words, contractors may choose whether to bid on the City's water works projects and thus, may choose whether to follow Section 320-5.

The Court agrees with ACI's argument that simply because a contractor can avoid these requirements by not bidding on City projects does not relieve the RBO from its undesirable classification, or instead, make it an incentive. Under the City's theory, the City could enact any local ordinance, requiring just about anything, and proclaim it not to be a mandate because contractors are not obligated to do business with the City. Upon review of the record, the Court rejects the City's argument, and concludes that based upon the plain language of the RBO, Section 320-5 is a mandate. Section 320-5 mandates something – namely, that bidders who seek to obtain water works construction contracts with the city maintain and participate in an apprenticeship program that satisfies the graduation requirement. The Court's conclusion in this case is in accord with the Sixth Circuit's finding in *Associated Builders* that the ratio and equivalency requirements of that statute with respect to apprentices "plainly contain mandates." *Associated Builders*, 543 F.3d at 282. The undersigned's conclusion does not change when considering that the provision at issue in this case is a city ordinance, rather than the state-wide mandate in *Associated Builders*.

The City argues that even if it is a mandate—a classification in which it vehemently denies—any connection with ERISA that the apprenticeship requirements might have is too remote to warrant ERISA preemption. *Dillingham*, 519 U.S. at 330.

After this Court granted injunctive relief, the First Circuit addressed the issue of preemption with respect to an exceptionally similar ordinance. *Merit Const. Alliance v. City of Quincy*, 759 F.3d 122 (1st Cir. 2014).[6] The First Circuit found that an ordinance, which required bidders on municipal public works projects to engage in a bona fide apprentice training program was preempted by ERISA. The Court in *Quincy* addressed the same arguments raised by the City, explaining as follows:

> [The City] asserts that even if its Ordinance constitutes a mandate, that should not be the end of the matter. In support, it suggests that '[t]he key distinction is between a statute that mandates or effectively mandates an aspect of law with which ERISA is concerned ... and a statute that does not.' *Assoc'd Builders & Contrs. v. Mich. Dep't of Labor & Econ. Growth,* 543 F.3d 275, 280 (6th Cir.2008). ERISA is a statute concerned with funding, its thesis runs, and local regulation of apprentice training standards is too remote to warrant ERISA preemption.
>
> This assertion is true as far as it goes, but it does not take the City very far. ERISA 'has more than one purpose'" *Simas v. Quaker Fabric Corp.,* 6 F.3d 849, 856 (1st Cir.1993). In addition to funding concerns, '[t]he uniformity of regulation gained by employers under ERISA was assuredly part of the legislative balancing of interests and trade-offs.' *Id.*

The purpose of uniformity was reiterated in *Davilla*, when the Supreme Court explained that ERISA seeks "to provide a uniform regulatory regime over employee benefit plans." 542 U.S. at 208. Specifically, impacting the uniformity of the structure and administrative practices for ERISA plans is an area with which ERISA is concerned. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9-10 (1987).

With that guidance in mind, the Court turns to the present case. To begin, uniformity is a concern in this case that was not present in *Associated Builders*, as the statute in question was a Michigan statute that imposed certain statewide ratio and equivalency requirements for

---

[6] *Quincy* relies, in part, on a case from the Eighth Circuit, *Minnesota Chapter of Associated Builders & Contractors, Inc. v. Minnesota Department of Public Safety*, 267 F.3d 807 (8th Cir. 2001), that the Sixth Circuit declined to follow and distinguished in its decision concerning apprenticeship standards and training in *Associated Builders*, 543 F.3d at 285. Accordingly, to the extent *Quincy* relies on the Eighth Circuit's decision, it is afforded little weight.

apprentice electricians, and did not otherwise address areas with which ERISA is expressly concerned. *Assoc'd Builders & Contractors v. Michigan Dept. of Labor*, 543 F.3d 276. Here, as in *Quincy*, the City seeks to enact a citywide ordinance. The First Circuit explained with respect to uniformity as follows:

> The Ordinance plainly disturbs that balance. Let us offer an example. Although the Ordinance requires the graduation of at least one apprentice within the previous twelve months, *see* Quincy, Mass., Code § 15.26.010(C), Fall River's counterpart ordinance required the graduation of at least two apprentices per year for the three years prior to a bid, *see Util. Contrs. Ass'n,* 2011 WL 4710875, at *7. Accordingly, compliance with the City's formula would not effect compliance with Fall River's; and so the Ordinance would 'requir[e] the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction.' *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 142, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). Such a result would be "fundamentally at odds with the goal of uniformity that Congress sought to implement" through the enactment of ERISA. *Id.*

This Court shares the same concerns regarding uniformity. The City goes to great lengths to distinguish the facts in this case from those in *Sherfel v. Newsom*, 768 F.3d 561 (6th Cir. 2014) relied upon by ACI. It explains that in *Sherfel*, the Sixth Circuit found that the state law at issue threatened national uniform plan administration. But the City fails to explain why the requirement to comply with various city ordinances could not have the same effect on uniformity of plan administration. Indeed, because the RBO is a local city ordinance, it requires contractors who do business elsewhere to tailor their plans to comply with other citywide ordinances enacted throughout the state of Ohio. This is particularly true when considering that the RBO obligates more than what is required under Ohio law. Specifically, Ohio Revised Code ("R.C.") § 4139.06 provides that participation in apprenticeship programs "shall be entirely on a voluntary basis." *Compare* CMC 320-5 *with* Ohio Rev. Code § 4139.06. Accordingly, because Ohio law does not require participation in apprenticeship programs, ACI contractors are

dependent upon the individual choices of apprentices to complete the program for five consecutive years.  (Doc. 52-3, PageID 428, ¶ 21).

The concern of uniformity in this respect becomes more than conjecture when considering the undisputed testimony of Steven Klinker, president of Dugan & Meyers Construction Company.  He testifies that "[e]ven though our employees are based in different states, Dugan & Meyers offers uniform compensation, including discretionary bonuses, health benefits, retirement benefits and discretionary profit-share benefits to all employees across all of our offices."  (Doc. 52-3, PageID 428, ¶ 5).  Thus, if ACI's members offer uniform plans to all employees across different states, a city ordinance that has more stringent requirements regarding apprenticeship programs could disrupt national uniform administration.  For example, if a contractor's uniform plan is not sufficient under the RBO, and it wants to continue to offer uniform benefits across all states, it would be forced to tailor its plan accordingly to bid on water works projects.  Therefore, such apprenticeship requirements differing from city to city within the same state are not readily adoptable by some employers.

Moreover, Section 320-5 specifies a success rate of one graduate per year for each of the past five years.  Evidence on the effect of this provision is scant, but undisputed nonetheless.  ACI provides evidence that the apprenticeship program in which its members participate cannot meet the five consecutive year graduation requirement due to its limited geographic area.  (Doc. 52-2, PageID 423, ¶ 13-15); Doc. 52-3, PageID 428, ¶ 18).  In fact, the undisputed evidence provides that the Laborer's Union apprenticeship program is the only apprenticeship program that satisfies the requirements of the RBO.  *Id.* at ¶ 19.  As a result, Section 320-5 not only acts as a time bar to programs of lesser duration, but also to programs with fewer participants by no fault of their own.  Those graduation requirements thus severely limit the choices employers

have for their apprenticeship programs, leaving only the Laborer's Union apprenticeship program. And the Laborer's Union apprenticeship program—the only adequate choice under Section 320-5's requirements—is not open to open-shop contractors. (Doc. 52-3, PageID 430, ¶ 20). Accordingly, regardless of whether ACI members wish to comply with Section 320-5, they are unable to do so in the RBO's current form.

Further still, the effect of Section 320-5 is to effectively require a minimum number of apprentices in the apprenticeship program. A law that specifies a minimum benefit level implicates ERISA concerns. *See Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 193 (4th Cir. 2007). And while it was clear in *Associated Builders* that the purpose of the statute was to promote workplace safety, it is not clear how the strict requirements of Section 320-5 further the City's intended purposes.

Accordingly, the Court finds that Section 320-5 impermissibly impacts the uniformity of the structure and administrative practice for ERISA plans. The apprenticeship requirements are more restrictive than those in *Dillingham* where employers were permitted to compete regardless of which option they chose for their ERISA plans, even though the costs of competing were dependent upon the option chosen. 519 U.S. at 332-34. Section 320-5 imposes requirements to compete at all; there is no more expensive option from which to choose. As such, ERISA preempts Section 320-5 of the RBO. ACI is entitled to summary judgment on this issue.

### ii. Pre-apprenticeship Training Fund (320-7)

The RBO does not stop at mandating requirements for apprenticeship training programs. It also requires contractors to pay $.10 per hour per worker into an MSDGC Fund 701 or Water works Fund 101 for a pre-apprenticeship program, which are separate funds to support qualified pre-apprenticeship programs. The payments, however, may not be taken from the fringe benefits

of the contractor's employees. The City argues that the fund is not related to an ERISA plan. Instead, it argues the fund is established and maintained by the City for purposes set by the City.

Again, for the same reasons discussed above, the Court concludes that Section 320-7 mandates something – specifically, the contractor's payment of a specified amount into the fund as well as the manner in which that payment to the fund shall be made. While the Court agrees with the City that the RBO applies to ERISA and non-ERISA plans alike and thus, does not reference an ERISA plan, the question remains whether the mandate has the requisite connection to an ERISA plan and, if so, relates to something that ERISA intends to preempt.

The Sixth Circuit explained in *Associated Builders* that the existence of a separate fund to support an apprenticeship training program triggers ERISA's potential application. *Assoc'd Builders*, 543 F.3d at 282. Moreover, Congress is concerned with the mismanagement of funds accumulated to finance employee benefits. *Dillingham*, 519 U.S. at 326-27 (citing *Morash*, 490 U.S. at 115). While the undersigned acknowledges that *Dillingham* does not explicitly extend to local apprenticeship funds, funds such as those required in Section 320-7 likewise threaten to affect the uniformity of ERISA plans.

The undersigned raised several concerns with the requirements of Section 320-7 in its Order granting preliminary injunctive relief; those concerns remain. First, the requirement that the employer not make the payment out of fringe benefits precludes the employer from reducing or otherwise changing the level of the benefit offered to its employees while mandating a specified rate of additional cost for the benefit. In that vein, Mr. Klinker explained that"[i]n recent years, we have decided to focus our compensation more on discretionary bonuses than on profit sharing, but before the RBO we retained the discretion to change the amount of our

contribution either from year to year, or to vary the compensation mix by increasing one and decreasing the other." (Doc. 52-3, PageID 428, ¶ 8).

Moreover, if an employer is required by law to make a payment directly to a specified benefit program out of funds other than its fringe benefits, it faces a potential quandary. Not only could the provided benefit be duplicative of a benefit the employer already provides, but integrating that benefit into an already-established ERISA plan would present obstacles given the potential funding discrepancies. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 13-15 (1987).

For example, Mr. Klinker explained that under the requirements of Section 320-7, "if every $1.00 in compensation paid by a contractor is divided so that seventy (70) cents of that $1.00 are wages and thirty (30) cents of that $1.00 are retirement benefits and profit sharing, CMC 320's pre-apprenticeship training fund requirement requires payment of an additional ten (10) cents per hour per worker, and prohibits the contractor from taking that money out of the thirty (30) cents of that $1.00 that are retirement benefits and profit sharing. Instead, CMC 320 requires additional compensation of ten (10) cents per hour per worker, which prevents the contractors from exercising their discretion to reduce the voluntary contribution to the benefit plan to cover the cost of the ten (10) cents mandated per hour per worker required by CMC 320 for the pre-apprenticeship training fund." (*Id.* at ¶ 23). Thus, in order to comply with Section 320-7, Dugan & Meyers could not exercise its discretionary right to change the amount of its contribution from year to year. This is precisely the harm that ERISA seeks to avoid. The City cites no authority to the contrary.

Finally, as the Court previously explained, the fact that the payment is involuntary and at a specified rate presents additional concerns about the impact of the provision on the structure and administration of existing ERISA plans. Unlike in *Dillingham*, the employers are not

presented with a choice between adopting a structure and obtaining an economic incentive or not adopting the structure and losing out on an economic incentive. Section 320-7 instead makes that choice for the contractor. While a contractor could avoid the requirement by choosing not to accept an award of the City's contract, the same issue would exist for each and every contractor that accepted the contract award. The type of choice and economic incentive referenced in *Dillingham* thus is not existent here.

Accordingly, the Court finds that Section 320-7 threatens to affect the uniformity of ERISA plans. This provision is not as remote from ERISA's regulatory scheme as the laws upheld in *Associated Builders* and *Dillingham*. As such, Section 320-7 is preempted by ERISA.

### iii. Lowest and Best Bidder Factors (320-3(j) and (k))

In addition to the apprenticeship requirements, the RBO also requires bidders on water works projects to certify whether they provide a healthcare plan and a pension or a retirement program to their employees. Moreover, the contributions to the plans are required to "be part of the employees' regular compensation and not merely part of the employees' compensation during the period of time for which the employee is performing work on the project," CMC 320-3(j). A bidder's certification is used by the City to determine whether a bidder is the best bidder on a contract. (Doc. 61-1).

The City argues that ACI "reads requirements into CMC 320-3(j) and 320(k) that are simply not there." (Doc. 61, PageID 1241). It asserts that there is no mandate and thus, these provisions are reporting requirements that have no effect on the calculation or disbursement of benefits. Specifically, the City argues that these reporting requirements are the type of tenuous, remote and peripheral details that do not raise ERISA concerns. *See Liberty Mut. Ins. Co. v. Donegan*, 746 F.3d 497, 507-08 (2d Cir. 2014) (recognizing that state reporting requirements

may withstand preemption when they impose no particular form of record-keeping, create burdens so slight as to create no impediment to uniform benefit administration, and seek information readily obtainable from the employer).  Determining whether a law is a mandate or incentive is not always a simple task.  *See Travelers*, 514 U.S. at 668.  Nevertheless, the Court must answer the question.

Under Sections 320(j) and (k), those who wish to bid on City water works projects must disclose information.  Specifically, Sections 320(j) and (k) mandate that the contractor with gross revenues of more than $2 million over the three preceding years certify whether it makes contributions to a health plan and pension or retirement plan as part of the regular compensation of the employees.  The Court once again acknowledges that the "mandate" is not a state-wide mandate applicable to all contractors as in *Associated Builders*.  Nevertheless, it still requires something of those that bid on the City contracts at issue and that satisfy the threshold gross revenue requirement.  Those who satisfy that requirement must comply with the provisions.  Application of these provisions thus rises to the level of a mandate.  This, however, does not end the inquiry.

Having concluded that these provisions are a mandate, the Court must determine whether the reporting and disclosure of the existence of a plan falls within the areas ERISA is intended to control exclusively so as to be preempted.  This inquiry raises two considerations: the reporting/disclosure requirement and the "regular compensation" requirement.  As stated previously, ERISA is concerned with the uniformity in the structure and administration of employee benefit plans.  One area in particular to which the concern extends is reporting and disclosure.  *Dillingham*, 519 U.S. at 330 (indicating that the areas with which ERISA is expressly concerned include "'reporting, disclosure, fiduciary responsibility, and the like'")

(quoting *Travelers*, 514 U.S. at 661). A provision is not preempted by ERISA, however, whenever it contains some type of reporting or disclosure requirement. The Court must also consider the objectives of ERISA and the effect of the requirements on an ERISA plan.

The reporting and disclosure requirements of ERISA stemmed from a concern about the "mismanagement of funds accumulated to finance employee benefits and the failure to pay employees['] benefits from accumulated funds." *Dillingham*, 519 U.S. at 326-27 (quoting *Massachusetts v. Morash*, 490 U.S. 107, 115 (1989)). Along with other requirements, the reporting and disclosure requirements of ERISA were established "'to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator.'" *Id.* (quoting *Morash*, 490 U.S. at 115). Viewing that concern together with the detailed reporting and disclosure obligations set forth in ERISA, it is apparent that the financial security of the plan participants and beneficiaries is a primary aim of the reporting and disclosure requirements. *See* 29 U.S.C. § 1021(a), (b); *Dillingham*, 519 U.S. at 326-37.

The Court has already concluded that bidders are mandated to disclose or report whether they makes contributions to a health plan and pension or retirement plan as part of the regular compensation of the employees. And the answers to those questions impact whether a bidder is considered the best bidder on a contract. Consequently, replacing the word *that* with the word *whether* creates a distinction without a difference.[7] Regardless of the City's word choice, the Court finds that application of this requirement impermissibly affects the level of benefits offered. If a contractor reports that it does not make contributions to the aforementioned plans,

---

[7] A former RBO provision differed only in that it required certification "that" instead of "whether" the employer maintained health care plans and pension or retirement programs for its employees.

despite being in compliance with ERISA, it will affect their chances of being awarded the contract.

Of particular concern to the Court is the "regular compensation" requirement.  While not defined in the RBO, the language of the provision makes it abundantly clear that the benefits must be provided all the time – not merely as part of the employees' compensation during the period of time for which the employee is performing work on the project.  At the preliminary injunction stage, however, the Court was unable to determine the effects upon the plan itself.

Mr. Klinker's affidavit addresses the Court's concerns, and in fact, confirms that the Court's concerns are indeed warranted.  He avers that some general contractors have different benefit structures for City and non-City jobs, and health and retirement benefits are not always offered to employees working on non-City jobs.  (Doc. 52-3, PageID 428, ¶ 11).  So, for example, if a contractor does not provide voluntary health and retirement benefits on non-City jobs, it would face the arduous task of completely altering its benefit plan in order to bid on a water works contract.  Otherwise, the contractor would fail to meet the requirements of Section 320-3.  This creates an impediment to uniform benefit administration, which ERISA seeks to protect against.  Accordingly, the Court finds that Sections 320(j) and (k) are preempted by ERISA.

**IV. CONCLUSION**

Consistent with the foregoing, it is hereby **ORDERED**:

3. The City and Local 265's Motions to Strike (Docs. 65, 74) are **GRANTED IN PART AND DENIED IN PART**;

4. ACI's Motion for Summary Judgment (Doc. 52) is **GRANTED**; and

5.   The City's Motion for Summary Judgment (Doc. 53) and Local 265's Motion

for Summary Judgment (Doc. 55) are **DENIED**.

This matter shall be closed and **TERMINATED** from the Court's docket.  The Clerk shall enter

judgement accordingly.

**IT IS SO ORDERED.**

        s/*Michael R. Barrett*
        Michael R. Barrett, Judge
        United States District Court